MUNROE et al. v. CITY OF CHICAGO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1912.)

No. 1,832.

NAVIGABLE WATERS (§ 20*)—FAILURE TO OPEN BRIDGE—LIABILITY FOR INJURY TO VESSEL.

The steamer Markham, going up Chicago river at night, when 800 feet away, signaled for the opening of the bascule bridge at Taylor street, owned by the city. The bridge was not opened, and the steamer proceeded for 400 or 500 feet at slow speed, signaling twice more, and then stopped and backed; but her momentum and the current carried her against the bridge and she was injured. The bridge was equipped, as required by the government regulations, with two red lights in the center, one on the end of each opening section, which changed to green lights when the sections and lights were raised. The weather was clear, and such lights could be seen by the steamer. An ordinance also required a signal light to be shown where for any reason the bridge could not be opened; but it was not observed. *Held* that, under the settled rules in admiralty, that it is incumbent on the owner of a bridge over a navigable stream to keep some one in charge to operate the same on proper signal, that the right of navigation is paramount, and that a vessel, having signaled, may properly proceed at slow speed, on the assumption that the bridge will open, until it appears by proper warning or in reasonable view of the situation that it will not, the steamer was not in fault, and that the city was liable for her injury.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. § 20.*]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in admiralty by William Munroe, the Michigan Trust Company, trustee of the estate of Thomas Munroe, William Brinen, A. F. Temple, and W. J. Brinen, as owners of the steamer Markham, against the City of Chicago. Decree for respondent (186 Fed. 564), and libelants appeal. Reversed.

This appeal is from a decree in admiralty which dismisses the libel in personam filed by the appellants, as owners of the steamer George C. Markham, to recover for damages sustained by the steamer, through collision with a bascule bridge crossing the Chicago river, alleged to be caused by negligence on the part of the city of Chicago in maintaining and operating the bridge. Dismissal resulted upon final hearing of the issues; and the facts in evidence, in reference to the navigation of the steamer and the signals upon the bridge—which failed to open in response to the signals from the steamer—are thus stated in the opinion filed by the trial court:

"On October 19, 1909, the steamer Markham was bound up the Chicago river, and while opposite Polk street signaled for the Taylor street bridge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The first signal was given when about 800 feet from the bridge. The Markham was proceeding under slow check, as slow, in fact, as it was possible for her to go and maintain steerage. It was about 5 o'clock in the morning. The atmosphere was clear, and the captain could see the two red lights in the center of the bridge. This bridge was of the jack-knife or bascule variety, and was equipped with the lights prescribed by the Lighthouse Board under the direction of the Department of Commerce and Labor, namely: There were placed on each leaf, near the point where they touched, and on the upstream and downstream sides, a square lantern swinging behind a frame containing a circular panel of red and green colored glass, with the result that when the bridge was closed there would be shown on the upstream and downstream sides two red lights close together in the center of the bridge, and when completely open two green lights at an elevation on each side of the opening. There were also stationary red lights at the lower side of each leaf, showing the width of the channel. The lights in the center of the bridge flashed red when the bridge was down, and green when the bridge was open. On the morning of the accident, the bridge was down, with the two red lights in the center showing, indicating that the bridge was closed.

"When the Markham had proceeded 200 or 250 feet, after her first signal, her master signaled again for the bridge to open. The bridge was not opened, nor was any bell rung (indicating to those on the street that the bridge was opening, or about to be opened), nor was any other signal given which could have led the master of the vessel to believe that the bridge was to be opened. The steamer then proceeded about 200 feet further down stream, when she signaled a third time and stopped her engines. The current was carrying the boat towards the bridge at about 3 miles an hour. and the captain, at this point realizing that the bridge was not going to open, backed the steamer. The momentum of the boat, however, carried it against the bridge, and a damage resulted, it is claimed, of $1,000. The pilot house was taken off and one of the spars broken."

Other facts, deemed material and controlling, are stated in our opinion.

Charles E. Kremer, for appellant.
Wm. H. Sexton, for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The appellants' libel was dismissed upon final hearing, pursuant to the conclusion stated in the opinion of the trial court, that "the accident in this case was due entirely to the fault of the master of the" steamer. All material facts—both in reference to the navigation of the steamer and of alleged negligence on the part of the city, whereon reversal is sought—are undisputed under the testimony, and we believe the rule of admiralty law which must be applied thereto leaves the inferences of ultimate fact free from difficulty. In Clement v. Metropolitan West Side E. Ry. Co., 123 Fed. 271, 273, 59 C. C. A. 289, 291. Judge Jenkins, speaking for this court, thus aptly defines the duties of the parties respectively:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary; the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the

bridge for the passage of vessels, and for the performance of such delegated·· duty he is responsible. It is also his duty to equip the bridge with proper lights, giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C. C. A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D. C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C. C. A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

And we understand the rule so stated to be the well-established doctrine of admiralty, applicable to the case at bar. As the opinion of the trial court recites (in conformity with the testimony), the steamer, laden with lumber, bound up the Chicago river, was about "800 feet from the bridge" when her "first signal was given," and "was proceeding under slow check, as slow, in fact, as it was possible for her to go and maintain steerage," moving with a current (variously estimated) at 2 or 3 miles an hour. Her signal for the bridge was twice repeated, with headway under further check, until within about 200 feet of the bridge, when she attempted to stop and back up, on discovering that no start was made in opening the draw. She was then unable to keep away from the bridge and the collision ensued. These occurrences were about 5 o'clock in the morning, "the atmosphere was clear," and the "two red lights in the center of the bridge" were in plain view throughout the approach. The finding of fault on the part of the steamer is therein predicated substantially: That these lights "complied with the requirements of the Lighthouse Board"; that the master of the steamer knew, when 800 feet away, that "the bridge was down"; that "the bridge tender gave no signal to proceed" and "no indication that the bridge was going to open," so that the master was not misled; and that "there was no time when he had any right to believe that the bridge was going to open," and he was bound "to keep his boat under such control" as to avoid collision. We believe this conclusion to be inconsistent with the above-mentioned rule, that "in the absence of proper warning" the vessel has "the right to assume that the bridge will be timely opened for passage," and that it cannot be upheld in the light of further circumstances which appear in evidence.

The regulations of the Lighthouse Board referred to (for display of two red lights) are applicable alike to all bridges spanning navigable waters, in thoroughfares of all grades of use, to indicate whether the draw is closed or open, so that the lights are down when the bridge is normally closed, and are in no sense indicative that the bridge will not open, on signal, for passage of a vessel. In populous cities, having numerous bridges over navigable waters, regulation may be need-

ful, consistent as well with the rights of navigation and with the requirements of street traffic and other exigencies, to give warning when a bridge cannot be immediately opened for passage of a vessel. So the city of Chicago has provided by ordinance for "vessel signals" to be maintained "at the several bridges over the Chicago river and its branches" (section 992), to consist of a red ball for use in the daytime and a red lantern (as specified) for the nighttime, to be elevated on the bridge "when upon the approach of any vessel," having "signaled for the bridge," the "bridge tender for any reason, cannot open the bridge," and so remain until it can be opened (section 993). The reasonableness of this provision is unquestioned, and we believe it entitles the navigator to expect such warning, if any cause prevented opening of the bridge upon his signal for it. Not only was no such warning given—nor notice in any form that the bridge could or would not be opened for the steamer—but it appears in evidence that this bridge was not equipped with such signals, although they were provided and used on other bridges of the city spanning the river. We believe, therefore, that no fault appears in the steamer's approach, under the check described, beyond the place of first signal, although it was then observed that "the bridge was down."

But the further question arises whether culpable fault appears in approaching within 200 or 300 feet of the bridge, even under her least speed for keeping steerageway; and its solution rests on other circumstances in evidence. The bridge was equipped with electrical power, with a bridge tender on each side to operate the two leaves of the bridge, and the opening was speedily accomplished when power and attendants were in readiness. It appears, however, that one of the bridge tenders had been called from his station and was on the dock when the steamer signaled for the bridge; that, recalled (by the signals or outcries), he hastened to the bridge, and in the excitement of the close approach of the steamer turned on the current so hurriedly that "the fuse blew out," so that the bridge could not be opened until another fuse was inserted, causing such delay that collision could not be avoided. The testimony does not establish the distance of the steamer from the bridge when this fuse accident occurred, but it is fairly presumable that no collision would have occurred otherwise. So—while the appellants' contention of defect in the electrical equipment is unsupported by the evidence—we believe no ground appears for condemnation of the steamer, as not "prudently proceeding under slow speed," in the absence of any warning that the bridge was not properly attended for timely opening. Not only was no warning given of the absence of the bridge tender, but it further appears in evidence that barges passed under the bridge, upbound, during the approach of the steamer, that men on the barges called out to the bridge tenders to open the bridge for the steamer, and that their cries were heard by the master of the steamer, who reasonably assumed that no further delay would occur. Without warning of any cause for delay therein, we believe that the steamer's approach was not unreasonable under the circumstances, and that she was placed in extremis by the failure of the bridge tenders to open the bridge, when it was too

late to haul over to the docks—the only other course reasonably open to her, during the approach, to abide the opening.

We are of opinion, therefore, that the collision was caused by failure on the part of the city to provide and give the warning signal, in conformity with its ordinance, that the bridge could not be opened promptly for an approaching vessel; that when the bridge tender was called away, leaving no one to operate the bridge meantime, the duty arose to give warning of the immediate disability, so that any vessel bound through the bridge in this busy channel could govern its course accordingly; and that the city of Chicago is answerable for the ensuing collision damages.

The decree of the District Court in admiralty is reversed accordingly, with direction to enter a decree in favor of the libelants and proceed thereupon for assessment of damages in conformity with the admiralty rules.