## THE BRIMSTONE.

## GENERAL CHEMICAL CO. v. ATLANTIC REFINING CO. et al.

(District Court, E. D. Pennsylvania. February 6, 1925.)

No. 231.

1. **Towage** ⬤⟹11(7) — **Navigation through drawbridge, injuring tow, held negligent.**

Where the master of a motor launch, with a tow, on approaching a bridge at night, gave the signal for opening of the draw, and immediately afterward on overtaking tug also signaled, and an answer was given from the bridge, and the draw raised, the master of the launch was not justified in assuming that the signal from the bridge was in answer to his signal, and it was negligence to attempt to follow the tug through without making sure that his signal had been heard and understood, and his owner was liable for an injury to the tow resulting from the closing of the draw before they had passed.

2. **Navigable waters** ⬤⟹20(8)—**City held liable for negligent operation of drawbridge.**

A city, as owner of a drawbridge over a navigable stream, *held* liable for injury to a tow through the negligence of the bridge operator in failing to hear or heed the signal of the towing vessel.

3. **Navigable waters** ⬤⟹20(8)—**Duty of those maintaining drawbridge to see that draw is properly operated.**

A bridge over a navigable stream is an obstruction to navigation, and when the federal

authorities authorize the construction of a bridge with a draw, the duty is cast on those maintaining it to see that the draw is properly operated.

In Admiralty. Suit by the General Chemical Company, owner of the barge Brimstone, against the Atlantic Refining Company and the City of Philadelphia. Decree for libelant against both respondents, and damages divided.

Conlen, Acker, Manning & Brown, and Everett H. Brown, Jr., all of Philadelphia, Pa., for libelant.

Howard M. Long, of Philadelphia, Pa., for respondent Atlantic Refining Co.

John Elcock, of Philadelphia, Pa., for respondent city of Philadelphia.

THOMPSON, District Judge. The barge Brimstone, owned by the General Chemical Company, on February 13, 1924, was in tow of motor launch No. 11, owned and operated by the Atlantic Refining Company, proceeding up the Schuylkill river, loaded with a cargo of acid to be delivered at the plant of the Atlantic Refining Company on the Schuylkill river at Philadelphia above the Passayunk avenue bridge. The Passayunk avenue bridge is a drawbridge owned and operated by the city of Philadelphia, and on the date in question the draw was in charge of a drawbridge operator in the employ of the city. At about 7:45 p. m., as motor launch No. 11 approached the bridge, it was raised by the operator and the tug, F. A. Churchman, which was without a tow, came up and passed the No. 11 and the Brimstone on the starboard side and proceeded through the draw. As the No. 11, with her tow, attempted to pass through the draw, it was lowered, and both its masts, 47 feet in height from the deck, collided with the draw. The foremast was torn out, and the aftermast broken. The foremast, in falling, did considerable damage to the barge.

The libelant claims that the collision between the drawbridge and the masts of the Brimstone, with the consequent damage, was due to the negligence of the master of motor launch No. 11 in attempting to proceed through the drawbridge without having received a signal to do so from the operator in charge of the bridge, and that the city of Philadelphia was negligent in causing the collision, in that the drawbridge operator was incompetent and inattentive to his duties, in failing to observe signals blown by motor launch No. 11, and failing to operate the draw in accordance therewith, by raising the draw and maintaining it at sufficient height to permit the barge to pass beneath it. There was no claim of fault on the part of the Brimstone. The barge, which was without motive power and without rudder, was lashed to the port side of No. 11. Her lights were properly set, and her master and crew had no duty to perform in her navigation.

[1] The entire controversy centers upon the question as to what signals were sounded by the No. 11, the Churchman, and the bridge, and the measure of care required in view of the signals. The regulations of the War Department under the River and Harbor Act of August 18, 1894 (28 Stat. 338), provide:

"When at any time during the day or night, any vessel, tug, or other craft unable to pass under the bridge, approaches it with the intention of passing through the draw, the signal for the drawbridge to be opened shall be three blasts of a whistle or horn blown on the vessel or craft. If the draw is ready to be opened immediately when the signal is given on the vessel or craft, the signal shall be answered immediately by two blasts of a whistle or horn blown on the bridge."

While the evidence is in part conflicting, I find from the pleadings and the testimony of witnesses so situated at the time as to be best qualified to observe the position of the vessels with respect to the bridge and the signals given that the facts are as follows:

It was a clear, moonlight night, with high tide, so that the water at and about the bridge was slack. When the No. 11, with the barge in tow, was 500 or 600 feet below the bridge, she gave a signal of three blasts with her air whistle, to which the bridge did not respond. She then blew three more blasts on her air whistle, when about 150 feet from the bridge, proceeding at half speed. The Churchman, when the first signal of the No. 11 was given, was considerably astern of her, but when the second signal had been given by the No. 11 the Churchman had overtaken her, so that her bow overlapped the stern of the No. 11. Immediately after the second signal of the No. 11, the Churchman blew three blasts upon her steam whistle, and the operator on the bridge blew two blasts. The Churchman, which was without a tow, proceeded at full speed past the No. 11 and her tow, and passed safely under the bridge, which had been raised to about 50 degrees. The drawbridge operator, who was in his watch box upon the bridge, eating his lunch, when the

signal of the Churchman was given, blew the two blasts of the whistle upon the bridge, raised the draw, and then immediately lowered it, without paying any attention to the approach of the No. 11 and her tow. If negligence is to be attributed to the master of the motor launch, it must be based upon his failure to exercise due care in proceeding without assuring himself that the two-blast signal from the bridge was in response to his signals.

It is contended by counsel for the Atlantic Refining Company that the master of the motor launch was justified in assuming that the signal for the bridge was in answer to his signals, notwithstanding that, in the interval between his last signal and that of the Churchman, there was no response from the bridge. The fact that the claim of his exercise of due care under the circumstances is based upon that assumption indicates that he was acting upon a guess, rather than a reasonable conclusion from the circumstances. He was fully aware of the approach of the Churchman, and saw her pass his motor launch and tow and speed ahead through the draw after the answering signal had been given. There was no current or tide to carry him ahead, and he should not have proceeded until reasonably certain that his signal had been observed and answered by the drawbridge operator, by repeating his signal, and, if necessary, stopping what way he had by immediately reversing his engine and assuring himself that the draw was open for the motor launch and barge before attempting to pass.

It could not reasonably be concluded, when the bridge gave the one signal of two blasts, that that was the signal for both vessels to pass through; but there would be a reasonable assumption to the contrary that the signals of the motor launch and her presence had not been observed. There being ground for assumption either way, he cannot be excused because he adopted the one assumption rather than the other, when, in the exercise of ordinary care, he could have made certain that the draw was open for him as well as for the Churchman.

My conclusion, therefore, is that there was such negligence on the part of the master of motor launch No. 11, under the circumstances, as was a contributing cause of the collision.

[2] The question remains whether the city of Philadelphia is to be charged with fault through the negligence of the drawbridge operator. The evidence convinces me that he did not exercise due care in his attention to signals and in vigilance in attention to his duties in the operation of the draw. He testified that, when he heard the signal of the Churchman, he was sitting in his watch box with the door open, eating his lunch; that he recognized the Churchman's whistle, with which he was familiar, as he had frequently heard it on former occasions; that he did not hear the signals of the motor launch, and that his answer was to the signal of the Churchman; and that, when she went through the draw, he did not know of the approach of any other vessel. He admitted, however, seeing two white lights above on a vessel, which would indicate the approach of a tug with a tow. I am not satisfied to accept his statement that he did not hear the signals of the No. 11. They were heard by a witness upon a vessel lying below the bridge, by the Atlantic Refining Company's guard from his station on shore, and by all of the other witnesses, and it is incredible that, from the same location at which he heard the Churchman's whistle, he heard neither signal of No. 11.

[3] A bridge across a navigable stream is an obstruction to navigation, and, when the federal authorities authorize the construction of a bridge with a draw, the duty is cast upon those maintaining the bridge to see that the draw is properly operated, so as to remove the obstruction to navigation in such manner that maritime commerce may be safely and expeditiously carried on. Munroe v. Chicago, 194 F. 936, 114 C. C. A. 572; Conklin v. Norwalk (C. C. A.) 270 F. 68. The negligence of the drawbridge operator is apparent, in that he paid no attention to the signals of the No. 11, which he must have heard or could have heard, if properly attending to his duties, and in lowering the bridge, after seeing an approaching vessel with two white lights above, and when, in the exercise of ordinarily careful observation, he must have known that the vessel was not the Churchman, which had passed through.

My conclusion, therefore, is that the city of Philadelphia was in fault through the failure of its employee to exercise due care under the circumstances. The case is therefore one of fault upon the part of both respondents, and a decree may be entered for the libelant against both respondents for divided damages and costs, with reference to a commissioner to ascertain and report the damage to the Brimstone, unless the parties shall agree upon the amount of damage without such reference.