## THE KARD.

### STAUB et al. v. DELAWARE DREDGING CO. et al.

No. 59 of 1927.

District Court, E. D. Pennsylvania.
March 7, 1930.

J. Thruston Manning (of Acker, Manning & Brown), of Philadelphia, Pa., for libelants.

Howard M. Long, of Philadelphia, Pa., for respondent Delaware Dredging Co.

Philip Price (of Barnes, Biddle & Myers), of Philadelphia, Pa., for impleaded respondent.

THOMPSON, District Judge.

Michael Staub, M. D. Kolyn, J. W. Thines, and Albert Mattson, copartners, trading as Michael Staub & Kolyn Construction Company, filed a libel in a cause of collision against the tug Kard and Delaware Dredging Company to recover damages to the dredge Leo incurred while the Kard was towing the Leo through the draw of the Petty Island railroad bridge of the Pennsylvania Railroad Company which is built across the channel of the Delaware river between Petty Island and the New Jersey shore. The dredging company, claimant of the Kard impleaded the Pennsylvania Railroad Company under the Fifty-Sixth Admiralty Rule (28 USCA § 723).

The Leo is a derrick barge sixty feet long, twenty-four feet beam, drawing about four feet of water, and at the time of the collision was equipped with a derrick boom rising seventy feet from the deck. The barge had no steering apparatus, but was dependent entirely upon the tug for her navigation.

On May 17, 1926, the libelants by verbal contract engaged the Kard to tow the Leo from the Delaware river dock of the Philadelphia Electric Company at Port Richmond to a point up the Cooper river where the libelants were engaged in the construction of a bridge. The Kard took the Leo in tow on a short bridle and proceeded across the Delaware river past the upper end of Petty Island. The Pennsylvania Railroad Company maintains a bridge crossing the river between Petty Island and the New Jersey shore equipped with a draw of "jackknife" construction. The draw can be raised to an angle of eighty-four degrees from horizontal position, and is operated by a bridge tender in the employ of the railroad from a house on the bridge.

Upon approaching the bridge, the Kard blew three blasts of her whistle, whereupon the bridge tender set the signals on the bridge to stop on-coming trains and opened the draw without, however, giving any signal in response to the signal of the tug. Instead, however, of raising the draw-span to the full height to which it could be raised, he raised it to only about fifty degrees from the horizontal. The master of the Kard, seeing that the bridge was being raised, proceeded to enter the draw, whereupon the boom of the Leo was brought into collision with the raised

draw-span, and, as a result, the derrick was broken, the "A" frame was knocked down, the house was crushed, and the barge otherwise damaged. The tug thereupon anchored the Leo at the mouth of the Cooper river.

Representatives of the libelants, the respondents, and the railroad company shortly after the collision held a survey, as a result of which it was agreed orally that the Kard should tow the Leo to a plant maintained by the respondent Delaware Dredging Company at Wilmington, where repairs agreed upon would be made. Mr. Kolyn, representing the libelants, agreed to place a hand pump on the Leo and to have two of the libelants' mechanics assist the Delaware Dredging Company in making the repairs. After that agreement had been entered into, the Kard on the afternoon of May 17 took the Leo in tow, and, instead of towing her to Wilmington, towed her out of the Cooper river to the wharf of the Campbell Soup Company at Camden, arriving there at about 6 p. m. The Leo was made fast by the crew of the Kard to a mud scow lying on the northerly side of the dock, and the Kard took its towlines from the Leo and left it in that position without leaving any one in charge for safeguarding or caring for the Leo. Under the direction of Mr. Kolyn, two mechanics in the employ of the libelants installed a hand pump on the Leo and pumped out what water was then in her hold. They left the Leo about 8 o'clock p. m. These men were acting under the direction of a foreman in the employ of the libelants named Parker who had been so directed by Mr. Kolyn. The Leo lay in that position overnight.

The arrangement for leaving the Leo at the Campbell Soup Company's dock was not in accordance with the agreement made between the representatives of the three parties at the time of the survey. The arrangement then made was that the Kard was to proceed to the Delaware Dredging Company's plant at Wilmington. There was no agreement that there should be a stop on the way unless stopping to take the two mechanics of the libelants aboard was impliedly included in the agreement.

When Parker, the foreman for the libelants, arrived at the dock at 5 o'clock on the following morning, the Leo was riding high in the water, but the Kard was not in attendance. About an hour later, the two mechanics reported for duty at the dock, and it was then discovered that the Leo was making considerable water and had taken a list to starboard aft. The hand pump was immediately manned, but the Leo filled and sank within an hour. Through the sinking of the Leo and her subsequent raising, she was further damaged and the libelants put to considerable expense.

The rules and regulations applicable to the operation of the drawbridge in question, promulgated by the War Department, under authority of the River and Harbor Act of August 18, 1894 (28 Stat. 338), are as follows:

"1. *Signals.*—When at any time during the day or night any vessel, tug, or other water craft unable to pass under the bridge, approaches it with the intention of passing through the draw, the signal for the draw to be opened shall be three blasts of a whistle or horn blown on the vessel or craft.

"If the draw is ready to be opened immediately when the signal is given on the vessel or craft, the signal shall be answered immediately by two blasts of a whistle or horn blown on the bridge; and if the draw is not ready to be opened immediately on the signal being given on the craft, the signal shall be answered immediately by one blast of a whistle or horn blown on the bridge.

"2. *Opening the Draw.*—Upon hearing or perceiving the prescribed signal, the bridge tender shall immediately clear the draw span and open the draw to its full extent for the passage of the vessel or other craft: * * * "

The bridge tender did not comply with those rules and regulations. Upon hearing the signal of the Kard and, after setting the signals to protect on-coming trains, he raised the span but not to its full extent. He did not look to see what was coming. He knew from the signal a tug was approaching, and gave himself no further concern. If he had looked he would have observed that the tug had the Leo in tow with her seventy-foot boom, the top of which was at least seventy-four feet above the water, and he would have seen enough to warn him that raising the draw-span partway, as he did, was not sufficient to give the boom clearance. The rules require that, either upon hearing or perceiving the signal, the bridge-tender shall immediately clear the draw-span and open the draw to its full extent for passage of the vessel or other craft. He did not open it to its full extent.

The engineer for the railroad company produced a blueprint from a drawing made by him showing the draw-span in closed position and also showing it at an angle of fifty degrees from the horizontal. The drawing showing the latter position was prepared in accordance with statements made to him by

the bridge-tender. If it had been raised, in accordance with the rule, to its full extent, it would have been at an angle of eighty-four degrees from the horizontal, which would have afforded clearance for the derrick barge to pass through in safety.

The rule stated in Clement v. Metropolitan West Side El. Ry. Co. (C. C. A.) 123 F. 271, and followed in Munroe v. City of Chicago (C. C. A.) 194 F. 936, is as follows: [1-3] A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary; the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for, the performance of such delegated duty he is responsible. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung, or raised and locked, and to critically examine the situation before proceeding, but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened. City of Chicago v. Mullen (C. C. A.) 116 F. 292.

■ The act of raising the draw-span, after the Kard had given the statutory signal, was an invitation for the tug with her tow to come on through the span, assuming that her safe passage had been given, The Louise Rugge (C. C. A.) 239 F. 458; and prima facie showed negligence on the part of the bridge tender, who testified on behalf of the railroad company that reply signals were not customarily given and that the only provision made for giving reply signals was a five or ten cent tin horn kept in the house on the bridge, which had not been used for five years.

The case was therefore within the rule as stated by Judge Woolley in Wright & Cobb Lighterage Co. v. Snare & Triest Co. (C. C. A.) 239 F. 482, 483, as follows: "We think

that in approaching the bridge and entering the draw, the Pioneer gave the only signal which under maritime rules or in prudence was required of her; that she was not in fault in assuming that the bridge was opened in response to her signal, and that, as reply signals from the bridge were not customarily given, the opened bridge was an invitation to her to come through, in accepting which there rested upon those operating the bridge, whether opened for the passage of one craft or two, the duty to permit her to pass through in safety."

The proctors for the railroad company cited the case of Great Lakes Towing Co. v. Masaba S. S. Co. (C. C. A.) 237 F. 577, as authority for their contention that, if the railroad company is held in fault, the damage must be divided because of the concurring fault of the towing tug. In that case, however, the evidence showed that the master of the tug saw, before entering the draw, that the draw-span was only partly raised and that, in attempting to pass through, his own negligence contributed to the injury.

■ In the instant case, the facts were the other way. The master of the Kard, having given the proper signal and seeing the draw rising, was justified in assuming that the bridge tender was doing his duty in raising the draw to its full height, and under the authority of the cases cited above, the bridge being an obstruction to navigation, he having no knowledge that the draw-span was not fully raised, had no duty put upon him to take a course through the draw to clear an obstruction of which he had no knowledge and which, in fact, was unlawfully existent. The railroad company must therefore be held liable in full for all damage directly caused by its negligence in the operation of the draw.

■ Further damage to the Leo is, however, shown to have been caused through carrying out an agreement between the libelants and the Delaware Dredging Company to depart from the terms of the agreement originally made at the time of the survey, to which the railroad company was a party, for towing the Leo to Wilmington for repairs. That agreement was not carried out, and the Leo was allowed to remain overnight at the Campbell Soup Company's dock with no one in charge. Her filling and sinking on the morning after the collision, it is found, were the consequence of her being allowed to remain there with no one on board to operate her pump. Although her leaking condition was caused by the collision, there is no evidence

848·

to show that she could not have been kept afloat with the observance of due care on the part of the tug for the voyage to Wilmington. The tug, in effect, abandoned her overnight, relying upon the engagement on the part of Mr. Kolyn, representative of the libelants, to see that she was in charge of the libelants' employees until the Kard should return in the morning to tow her to Wilmington. The Leo's owners, having taken upon themselves her custody and care, must be held liable for failing to exercise care. Whatever damage accrued to the libelants by reason of this departure from the agreement with the railroad company must, therefore, be divided between the Kard and the Leo. There were in the instant case new negligent acts on the part of the master of the Kard and the owners of the Leo, the results of which would not have necessarily followed the collision if these litigants had performed their duties under the agreement with the railroad company, taking upon themselves voluntarily the duty of the care of the Leo before the proposed towage to Wilmington.

A decree may be entered for the libelants against the Pennsylvania Railroad Company for damages in the amount of $1,500, as agreed at the time of the survey, with interest from the date when repairs reasonably could have been made, or, if the cost of repairs for such direct damage be less than that amount, for the amount of the cost thereof with interest from such date, The Scotland, 118 U. S. 507, 6 S. Ct. 1174, 30 L. Ed. 153, and for damages divided between the Kard and the Leo arising out of the sinking of the Leo. The cause will be referred to a commissioner to ascertain and report the damages in accordance with this opinion.