## THE EUREKA.

### MULTNOMAH COUNTY v. HAMMOND LUMBER CO. et al.

No. 7857.

Circuit Court of Appeals, Ninth Circuit.

Nov. 18, 1935.

James R. Bain, Dist. Atty., and M. B. Meacham, both of Portland, Or., for appellant.

E. L. McDougal, Randall S. Jones, and Lawrence Lister, all of Portland, Or., for appellees.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

The steamship Eureka, owned by appellee Hammond Lumber Company, was damaged at Portland, Or., in a collision with the east leaf of the "Burnside Bridge," a drawbridge over the Willamette river, a navigable stream. The bridge is owned and operated by the appellant, Multnomah county, Or., a municipal corporation and body politic. It is of the bascule type operated electrically. There are two spans known as the east and west spans, and when both are open the clearance is 205 feet. Upon proper signal, properly answered, the bridge tender started to open the draw to allow the Eureka to pass. The west leaf opened promptly, but, because of some defect in the control mechanism, the east leaf could not be raised. The Eureka changed course in an attempt to go through the open span, but her mainmast and rigging failed to clear the east leaf and were injured by the resulting collision. The trial court held that the bridge tender was negligent in failing to signal the approaching vessel that he could not open the east draw, and awarded damages in the sum of $6,926.63 for the repair of the vessel, which, together with small sums for loss of the use of the vessel and for the payment of the crew, amounted to $7,735.63, with $66.89 to the appellee Chevrolet Motor Company of California for damages to two automobiles on the steamer's deck, which were injured as a result of the collision.

The appellant assigns the finding of negligence as error, and claims that the Eureka was negligent in not keeping a proper lookout. Appellant also claims that the pilot of the Eureka was incompetent and that the court erred in excluding evidence to prove such incompetence, and that the improper navigation of the vessel was the sole cause of the injury.

That no warning signal was given by the bridge tender after he had signaled the Eureka to proceed is admitted. That the steamer saw the danger and attempted to avoid the collision is undisputed. The only question as to the negligence of the bridge tender is as to whether or not it was his duty to give some danger signal when he found he could not open the east span. As to the negligence of the Eureka, the main question is whether its speed was too great and whether the steamer should have stopped when it was first seen that the raising of the east span was delayed. The use of a port helm as it was passing through the open span is also claimed to be negligence.

The collision occurred at 2:26 p. m. on a clear day. The call signal for the opening of the bridge was given when the Eureka was about 2,200 feet above the bridge, passing through the Morrison bridge draw. It was acknowledged promptly in conformity with the rules promulgated by the War Department for the control of navigation at this bridge. The rules prescribe a call for Burnside bridge of one long and two short blasts "as notice to bridge operators to open the draw" the same signal in reply "indicates that the operator intends to open the bridge as soon as practicable." Rule 1. The rule provides for a danger signal of a series of at least four short blasts. "Its purpose is to answer the call of a vessel, but to indicate that the draw cannot or will not be opened at once, or, when vessels are waiting in the vicinity that the draw if open, is about to be closed. It is also

used in an emergency to revoke an acknowledging signal." Rule 1. "In case the draw cannot be opened at once when the call signal is given, the operator shall promptly answer the vessel calling by giving the danger signal and shall repeat the same, if necessary. * * *" Rule 9. It takes 45 seconds to open the draw, and a lag of 10 seconds is allowed after one leaf starts to rise before the other is started. This is done to avoid jamming the two spans. The call signal is to be given by the vessel when it is at least 1,000 feet away. Rule 5. The bridge tender testified that while the Eureka was approaching he gave his whole attention to raising the west span and an attempt to raise the east span, and that he gave no warning signal.

Capt. Jacobson, pilot of the Eureka, gave the speed of the vessel over the ground as a mile and a half to two nautical miles per hour, the river current toward the bridge as "around a mile"; that is, from three-quarters of a mile to a mile per hour, with a resulting speed through the water of from one-half to one and one-quarter knots per hour. The river current sets slightly toward the east bank of the river. A northwest wind was blowing about 10 miles per hour. The Eureka was headed about north. Concerning the collision he testified as follows: "When I was four or five hundred feet south of the bridge the west leaf started to rise and I proceeded very slow starting through the water. Then when I was around one hundred and fifty to two hundred feet I realized, or became skeptical if the west [east] leaf would open so I ordered the engines half ahead and starboarded the helm, hard astarboard helm, and edged over toward the west side. As the vessel entered the west span, when I was about half through, half of the vessel was in the span, I ported the helm and straightened the vessel out. The stern sagged down and I realized that there was going to be a contact. So I put the vessel full speed astern in an attempt at retarding the speed, and at the same time swinging the stern of the vessel back—the vessel backs to port—swinging the stern over to clear. But I was not successful. The after rigging caught on the southwest corner of the east leaf of the Burnside bridge, and took out the No. 4 booms and starboard boom No. 3, and the mainmast. * * * I was heading twenty to twenty-five feet to the west of the east leaf, favoring the west about twenty-five feet."

The Eureka was 289 feet long, beam 42 feet, draft 16 feet aft, and 10 feet forward. With reference to the question of excessive speed, it is sufficient to say that appellant's witness Capt. A. R. Pearson, a Columbia river pilot, testified that the usual time from the Morrison bridge to the Burnside draw was three to four minutes. The evidence upon which appellant relies shows that the Eureka took fully that time (2:19 p. m. to 2:23 p. m.) from the Morrison bridge to a point 400 or 500 feet above the Burnside draw, where it was observed that the west span was rising. It is clear that the speed of the Eureka up to this point was not excessive. Both sides contend that at 150 to 200 feet from the bridge a collision was unavoidable by any action of the Eureka under the circumstances in which she was then situated. The controversy simmers down to the question as to whether or not the Eureka was justified in proceeding about a ship's length in distance, and about a minute of time, after observing that only one span of the bridge was lifting.

The bridge tender testified that it took 2 to 3 minutes, according to the traffic, to clear the bridge, and 45 seconds to raise a span. Thus for at least 3 minutes the Eureka was justified in assuming that the draw would be opened. This faith was justified a minute later by the lifting of the west span. Was a prudent navigator bound to assume without other warning that the delay in lifting the east span was due to mechanical difficulty which could not be overcome within one minute? The bridge operator knew something was wrong, but acted on the assumption that he could overcome the difficulty in time to allow the Eureka to pass safely, hence he gave no danger signal, although provided with a whistle operated by compressed air which could be used for that purpose. The bridge and its elevating mechanisms had been kept in good repair and had not theretofore failed to function. The Eureka had no reason to anticipate mechanical trouble. The cause of the failure is still unknown, for the east span was successfully lifted a few minutes later, without any repairs or changes being made. It is suggested that dust or dirt on some of the contact points may have caused the temporary failure. Was the Eureka entitled to rely upon the absence

of a danger signal under the circumstances? Such a signal could and should have been given instantly. It is clear from the rules above quoted that the acknowledgment call was an invitation to the Eureka to proceed. It has been so decided in similar cases. Clement v. Metropolitan West Side El. R. Co. (C.C.A.7) 123 F. 271; Munroe v. City of Chicago (C.C.A. 7) 194 F. 936; Newtown Creek Towing Co. v. City of New York (C.C.A.2) 47 F. (2d) 883. Both rules 1 and 9, supra, and the situation confronting the bridge operator (Clement v. Metropolitan, etc., R. Co., supra) called for the danger signal. None was given, and this failure was an act of negligence. The pilot of the Eureka was entitled to rely upon the answering signal until revoked, or until it should be apparent to a reasonably prudent navigator, having knowledge of the previous operation of the draw, that the invitation to proceed could not or would not be complied with. The trial court held that the failure of the bridge tender to give a warning signal entitled the Eureka to proceed as she did, slowly and under control, and that the subsequent efforts to avoid the collision were not negligent in view of the peril in which she was placed by the neglect of the bridge operator.

The appellant seeks to excuse the bridge operator's failure to give the danger signal by the claim that he was acting in an emergency created by the speed of the vessel. This would reverse the rule. The emergency resulted from the failure of the bridge mechanism to work, and was in no sense attributable to the Eureka. It is the Eureka that is entitled to invoke the rule which excuses errors when acting in an emergency in measuring its conduct from 200 feet above the bridge to the point of collision. See City of Chicago v. Michigan, I. & I. Line (C.C.A.7) 201 F. 89; Munroe v. City of Chicago (C.C.A.) 194 F. 936.

The appellant relies upon the decision in The No. 9 (D.C.) 258 F. 693, but that case turned upon the fact that the master of the approaching tug knew the drawbridge he was approaching was out of order and has no application to the facts in the case at bar.

If we assume, contrary to appellees' evidence and contention, that the Eureka should have had other lookouts than the master and pilot and the officer in the bow, Dahlmer v. Bay State, etc., Co. (C. C.A.) 26 F.(2d) 603; The Paris (D.C.) 37 F.(2d) 734, such failure had nothing to do with the accident, and consequently is not available to the appellant as a proximate cause of the accident, The George W. Elder (C.C.A.9) 249 F. 956.

The charge that the pilot of the Eureka was incompetent is based upon his failure to stop the Eureka before reaching the point 150 feet above the bridge. As we have held that he was not negligent in so doing, the charge of incompetency falls with the claim of negligence.

Appellant claims that the appellees should have produced as witnesses the helmsman, mate on deck, and engineer on watch at the time of the collision, and that by reason of such failure it is entitled to invoke the rule that, where there are witnesses who are not called by a party under a duty to do so, it is presumed that, if called, their testimony would be unfavorable, citing The Cananova (D.C.) 297 F. 658, 662. We are unable to see what further light they could shed on the facts which in the main are undisputed, and the appellant does not inform us. Under these circumstances the rule is not applicable. See, Redwood S. S. Co. v. U. S. Shipping Board, E. F. Corporation (C. C.A.9) 18 F.(2d) 382.

Appellant concedes that the owner of an injured vessel is entitled to recover for the loss of her use while laid up for repairs, but claims that the proof is insufficient to sustain the finding of the trial court of a loss of $100 per day. The district manager of the Christenson-Hammond Line testified that the earnings of the Eureka were conservatively $100 per day and that earnings subsequent to the collision as well as before showed such daily earnings. This evidence was clearly sufficient to sustain the finding, in the absence of any evidence to the contrary.

Decree affirmed.