SHELL PETROLEUM CO., Ltd., as Owner of THE M/S LEMBULUS, Libelant,

v.

Charles PESCHKEN, Canolius V. Hines and Fred W. Bents, Respondents.

Civ. A. No. 793–59.

United States District Court
D. New Jersey.

June 24, 1960.

McCarter & English, by Francis E. P. McCarter, Newark, N. J., for libelant. Robert M. Julian, New York City, of counsel.

David D. Furman, Atty. Gen. of New Jersey, by Alfred P. D'Auria, Deputy Atty. Gen., for respondents.

WORTENDYKE, District Judge.

This case properly invokes the Admiralty jurisdiction of this Court. The cause of action alleged in the libel arises out of a collision between the British Motor Tanker Lembulus, owned by libelant, and the draw section of a New Jersey State Highway bridge over the Hackensack River, a navigable body of water of the United States, on December 20, 1957. The bridge is also locally known as the Lincoln Highway bridge, and extends between Jersey City and Kearney, New Jersey. The respondents were employees of the New Jersey State Highway Department, who were charged with and engaged in the performance of the duty of operating the highway drawbridge with the draw section of which the collision here involved occurred.

The Bridge Act of 1906, 33 U.S.C. § 499 provides that it shall be the duty of all persons operating and tending drawbridges built across the navigable rivers and other waters of the United States "to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of the Army the public interests require to govern the opening of drawbridges for the passage of vessels * * *, and such rules and regulations * * * shall have the force of law." Rules and regulations have been promulgated by the Secretary of the Army for the operation of the Lincoln Highway bridge and are to be found in 33 C.F.R. 203.200(d) and (e), which provide:

"(d) When a vessel approaches within signaling distance of a bridge for passage, the master thereof shall signify his intention by three blasts of a whistle or horn. * * * The signal of the craft shall be immediately answered by the tender or operator of the bridge. If the draw is ready to be immediately opened, the answer shall be three blasts of a whistle or horn from the bridge. In case of delay in opening the draw, as is provided for in this section, or as may be necessary by accident to the machinery or other contingency the signal from the vessel shall be answered by two long blasts of a whistle or horn from the bridge * * *. In all cases when delay signals have been given, a signal of three blasts of a whistle or horn shall be given as soon as it is possible to open the draw.

"(e) Upon hearing or perceiving the signals prescribed, the tenders or operators of a drawbridge, except * * * shall at once open the draw signaled for so as to allow the prompt passage of any vessel: * * *."

Other regulations promulgated by the New Jersey State Highway Department for the operation of the drawbridge provided that if the opening were delayed abnormally, due to traffic conditions or failure of equipment, "the signal of two blasts is to be repeated at intervals until the draw can be moved."

The evidence at the trial disclosed that the vessel had been moored at Kopper's Wharf on the westerly bank of the river at Kearney Point, New Jersey, some distance north of the Lincoln Highway bridge, discharging cargo. After cargo discharge, the vessel, in ballast, for a voyage to Curacao, Dutch West Indies, cast off from the wharf and proceeded downstream upon the river, followed by two tugboats which had assisted in turning the vessel about after she cast off. She had been moored at the wharf port-side to, with the bow in an upstream direction. The Lembulus was

466 feet 2 inches in over-all length, had a beam of 54 feet 7 inches, and a loaded draft of 25 feet 7½ inches. Her gross tonnage was 6,503. In ballast, as she was upon her departure, her forward draft was 13 feet and her after draft 17 feet. She was clear of the wharf at 1529 hours on the date stated, and headed downstream, or seaward, at 1542½ hours. The wind was fresh to strong from the southeast, and squally, with intermittent rain showers, and there was an incoming tide.

Before reaching the bridge with which the collision occurred, in her progress down the river, it was necessary for the vessel to negotiate, in the following order, the Lackawanna Railroad Bridge, and the so-called City bridge, a short distance to the south of the Lackawanna bridge, both of which are drawbridges, and then to pass beneath the fixed Pulaski Skyway bridge. Because of her position at the wharf during the cargo discharge operations, it became necessary for her to be turned around. There was some conflict in the testimony respecting the location at which the vessel, with the assistance of the two tugs, was turned about. The master of the vessel testified that this maneuver was executed to the south of the Lackawanna bridge, after the vessel had been towed stern-first through that draw, whereas evidence for the respondents was to the effect that the turn-around took place to the north of the railroad bridge and that the vessel passed through the draw of that bridge bow first. The vessel's Deck Log book discloses: "1537 V/L swinging in river. 1542½, V/L swung, slow ahead, proceeding downriver. 1543½, Lackawanna bridge opened. 1546 dead slow ahead, V/L cleared Lackawanna Bridge." These entries are confirmed by similar entries in the bridge movement book and in the engine movement book of the vessel. Whatever may have been the manner of her passage of the Lackawanna drawbridge, she accomplished it without incident, and her passage through the City bridge draw was also uneventful. Her navigation, while proceeding downstream, was under the control of Captain John Bassett, a Dock Master and River Pilot, employed by the owner of the two tugboats above mentioned, but his testimony could not be presented because of his death before the trial. However, the testimony of Captain Hawkins, the Master for the vessel, who was with the Pilot on the vessel's bridge during the operation, disclosed that, at 1546 hours, while passing through the draw of the City bridge, which crosses the river at a point 1.1 nautical miles to the north of the bridge with which the vessel collided, the Pilot signalled for the opening of the latter bridge by three blasts of the vessel's whistle. The giving of this signal is corroborated by the Chief Bridge Operator in his written report, following the collision. This signal was acknowledged by the Highway bridge by two blasts of its horn (the prescribed warning of delay in opening the draw), but the drawspan of the bridge nevertheless commenced to rise almost immediately.

The bridge operator, respondent Peschken, stated in his post-collision report to the New Jersey State Highway Department: "We knew that the tugs had gone up the river for the steamer and we were watching for them. When we seen (sic) them coming I signalled the gatemen to close the gates and I gave the steamer two long blast (sic) on the horn. Due to electrical trouble on the bridge this was done before the steamer reached the Skyway. The span was in upward motion before the steamer was under the Skyway." He testified on the trial, however, that he gave a second two-blast signal after the respondent Hines told him the vessel was "coming down pretty fast." Respondent Hines testified to a similar effect.

As the vessel was in the vicinity of the Pulaski Skyway bridge, its speed had been reduced to slow ahead. At 1555 hours the bridge drawspan appeared to the master to have stopped rising and the vessel's engines were immediately brought to dead slow ahead and then to stop. At 1555½ hours they were

·driven full astern. By that time the position of the vessel with reference to the drawspan was such as to create doubt whether her masts would clear the drawspan of the bridge. The reversal of the ·engines was insufficient to eliminate all way from the vessel, and the fore topmast hit the bridge drawspan section, which was struck again within a few moments thereafter by the main topmast. After the latter contact the bridge drawspan section rose or continued to rise to its fully elevated position. Upon inspection, the points of contact of the span girder were found to be 9 feet 10 inches below the truck on the fore topmast and 6 inches below the truck on the main topmast. Following these collisions, the vessel proceeded to the marine repair yard of Bethlehem Steel Company at Stapleton, Staten Island, New York, where the damage was repaired. The voyage to Curacao was then resumed on December 23, 1957.

Captain Hawkins testified that after the Highway bridge signaled to acknowledge the vessel's signal, no further warning of the stopping or slowing of the rise of the drawspan, or of any difficulty in its operation, was given, and that the orders to stop and reverse the engines were given upon the Pilot's visual observation from the vessel's bridge of the slowing or stopping of the lifting of the drawspan.

Respondents concede that the vessel passed through the Lackawanna bridge draw at 1546. This fact is disclosed by the log book of the tender of that bridge, as well as by the deck log book of the vessel. The bridge tender of the City bridge testified that the vessel passed through his draw at 1548 hours. She was then somewhat over one-half a nautical mile north of the Pulaski Skyway fixed bridge beneath which she was about to pass, and at that time the Lincoln Highway bridge's draw section was already in upward motion. Libelant contends that the vessel's fore topmast struck respondents' draw section at 1557 hours, ship's time. Respondents' drawbridge log reports the vessel's passage through the Lincoln Highway draw between 3:42 and 3:48 p. m. (1542/1548 hours). This entry is obviously incorrect, especially in view of the entry in the railroad bridge tender's log book that the vessel passed through the Lackawanna draw at 1546. If the vessel passed through that draw at 1546 and through the City bridge draw at 1548 hours, she could not have reached the Lincoln Highway bridge, 1.1 nautical miles away, at the same instant. I find as a fact that the vessel covered the distance to the Lincoln bridge in nine minutes, or at the rate of 743.132 feet a minute, an average of 7.33 knots. The Captain of the Lembulus, however, admitted that her average speed between the Skyway and the Lincoln Highway bridges was 9 knots. Average speed between the designated points is misleading, however. A high speed at the start and slow speed near the finish averages the same as would the reverse of those speed allocations. I am concerned with the speed of the vessel between the moment the bridge span commenced to rise and that of the collision. Her course was generally southwest; the wind was fresh to strong from the southeast, and she was moving against an incoming tide. She had slowed from full ahead to slow ahead at 1553 hours, five miutes after passing through the City bridge draw and four minutes prior to the collision, and her engines were stopped at 1555 hours and at 1555½ hours were ordered to full astern. They were going full astern at the moment of collision. A master mariner, familiar with vessels of the size of the Lembulus, and with the Hackensack River channel in which she was proceeding, testified, for respondents, that under the circumstances and conditions existing at the time of the occurrence here in question the maximum safe speed for the vessel between Koppers Wharf and the Lincoln Highway bridge would be 3½ to 4 knots. But this opinion of the witness was predicated upon the assumption, contrary to fact, that the tide was ebbing. The opinion of this ʼexpert that a speed of 9 or 10 knots

between Kopper's Wharf and the Lincoln Highway bridge would be excessive does not impel me to conclude that the vessel was moving at an excessive speed over the ground between the point at the Skyway bridge where she signaled for the opening of the draw at 1553 hours, with her engines at slow ahead, and that of her contact with the draw section at 1557 hours. Between these two points her engines reached no higher speed than dead slow ahead, and they were going full astern at the moment of collision. I am not convinced that the speed at which she was traveling was immoderate or excessive because of the existing weather and tidal conditions.

As already pointed out, the regulations governing the operation of the Lincoln Highway drawbridge as the Lembulus approached it required the vessel to indicate her intention to pass through the draw by three blasts of her whistle when within signaling distance of the bridge. It is uncontradicted that the Lembulus complied with this requirement. The bridge operator was required, by the same regulations, to answer the vessel's signal with three blasts of the bridge's horn if the draw was ready to be immediately opened, but if there were delay incident to mechanical failure or otherwise, he was required to so indicate by two long blasts of the bridge horn. 33 C.F.R. § 203.200. Captain Hawkins testified that as the Lembulus was "about to pass under the Skyway bridge at approximately 1553 hours, three whistle blasts were blown" by the vessel as a signal to the bridge to open. He further testified that "the bridge answered our signal and commenced lifting almost immediately." It will be observed that the Captain did not say of how many blasts the bridge's answering signal consisted. The vessel's speed was then reduced to dead slow ahead to enable her to shape course to pass through the comparatively narrow opening afforded by the draw. That the drawspan was rising in what appeared to the vessel to be a normal manner following its reciept of her signal, but that the span then seemed to

slow to such an extent that it was difficult to tell whether it was still moving or had stopped, was confirmed by the testimony of the Captain of 'one of the tugboats, which accompanied the Lembulus as she approached the bridge. He also testified that the Lembulus was moving very slowly as she approached the draw. He, however, was not asked how many blasts were given by the bridge tender in answer to the vessel's signal, nor whether any subsequent warning was sounded from the bridge.

Peschken had been aware for some time previous to the date of the collision that the electrical operating mechanism of the drawbridge was in a defective condition. Respondents' witness, Iannaccone, in charge of maintenance of the electrical bridge draw operating facilities for the State Highway Department, had discovered some time previously a malfunction in the mechanism of the Lincoln Highway bridge, which manifested itself only when the speed of the bridge opening was above what he called the "third power point". It was known to the electrical supervisor as well as to the drawbridge operator that the draw could only be opened slowly because of the risk of stoppage through power failure. Despite the two-blast response of the bridge to the vessel's three-blast signal to open, the prompt commencement of the draw opening was inconsistent with the implications of the two-blast bridge response, and constituted no notice that the draw would open slowly or stop during its rise. The vessel was entitled to assume that it might proceed with safety from the point at which it was at the time the span commenced to rise.

There is another aspect of the case which discloses failure of the drawbridge operator to exercise the degree of care imposed upon him not only by the governing regulations, but also because of the peculiar circumstances of the situation, including his knowledge of the risk of stoppage of the draw through power failure. The electrical supervisor testified that the draw opening mecha-

nism was provided with dual control systems so that, in the event of failure of one, an alternate might be used in the lifting of the drawspan. The slowing or stopping of the draw, which occurred in this case, and which unquestionably resulted in the damage to the topmasts of the vessel, satisfies me that the power failure actually occurred, and that the alternate control available to overcome such failure was not employed.

A bridge spanning a navigable river which constitutes an obstruction to navigation must be so maintained and operated that navigation may not be impeded more than is absolutely necessary. The right to navigate the river is paramount to the right to maintain a bridge across it, and therefore a bridge must be so constructed and maintained that it may be readily opened to admit the passage of vessels. "If for any reason the bridge cannot be opened, proper signal is to be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, (from the bridge) the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding * * * but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the (vessel's) signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened * * * when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern." Clement v. Metropolitan Westside Elevated Railway Co., 7 Cir., 1903, 123 F. 271, 273; Munroe v. City of Chicago, 7 Cir., 1912, 194 F. 936, 940. The duty of the bridge operator to signal if the draw cannot be opened at all is the same as that required if the draw cannot be opened sufficiently to permit the vessel's passage without contact

therewith. The same rule was applied under similar circumstances in The Kard, D.C.1930, 38 F.2d 844, and still more recently by Judge Meaney of this Court, in Conners Marine Co. v. New York & Long Branch Railroad Co., D.C.1950, 87 F.Supp. 132. Respondents seek to distinguish The Kard, supra, Clement v. Metropolitan Westside Elevated Railway Co., supra, and Munroe v. Chicago, supra. In The Kard the bridge tender gave the signal in response to that of the tugboat, raised the drawspan to less than the required height and the tow collided with the bridge. In that case, however, as in the Clement case, the failure of the bridge tender to give the vessel warning, coupled with the partial raising of the drawspan, was held to have constituted an invitation to the tug to come on through. In the Munroe case, 7 Cir., 1912, 194 F. 936, certiorari denied 229 U.S. 609, 33 S.Ct. 464, 57 L.Ed. 1350, the vessel which was ascending the Chicago River at night, signalled for the opening of the drawbridge owned by the City. The bridge was neither opened nor was any warning given that the bridge owner (City) had failed to keep someone in charge to operate the draw upon proper signal from a vessel. The decree for the City was reversed.

A similar situation existed in The Louise Rugge, 3 Cir., 1917, 239 F. 458, although in that case the bridge was a temporary structure and the vessel had laid-to until the light on the end of the span showed that it had been raised and stopped. There was no warning given by the bridge tender that the vessel should not attempt to navigate the passage.

Portions of the deposition of the respondent Peschken, taken pursuant to Rule 26, F.R.Civ.P., 28 U.S.C., were read into the trial record, and disclose that he then testified that when his men notified him that the steamer was coming, it was some distance up-river and had not yet reached the Skyway where she gave her three-blast signal. Peschken was aware of the electrical trouble with the drawbridge mechanism, and therefore com-

menced to open the draw as soon as he was aware of the vessel's approach. He also testified that the span was in upward motion before the steamer was under the Skyway bridge, but that he was opening the draw slowly as a precaution against a recurrence of the previous electro-mechanical failure. Peschken also testified upon these depositions that although he was aware that the regulations required, in case of delay in opening the drawspan due to failure of equipment, that the two-blast warning signal be repeated at intervals until the draw could be moved, he did not, at any time, comply with that requirement or with the requirement that three blasts of the siren be given when the span starts to rise. In refraining from giving the required three-blast signal when the draw commenced to open, and in giving instead a two-blast signal Peschken said he was following his usual practice. Despite this testimony on deposition, Peschken testified at the trial that he had repeated the two-blast signal to the vessel before the collision. If such testimony is true, it would indicate that the bridge tender twice warned the vessel to stand off, although at the same time continuing to open the drawspan.

■ Respondents argue that because the evidence disclosed that there were frequent heavy rain showers on the day of the collision, the vessel was required to sound a prolonged blast of her whistle at intervals of not more than one minute in compliance with 33 U.S.C. § 191, which provides for such a signal "in fog, mist, falling snow, or heavy rain storms." Because of the admitted non-compliance with this requirement on the part of the vessel, respondents seek to apply "The Pennsylvania" rule (The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148), which requires that a vessel bear its own loss unless she can show that her fault could not have contributed to the accident. I conclude that the cited statutory section is not applicable in the circumstances disclosed by the evidence in this case. In The Pennsylvania, the collision between the two vessels occurred in a very dense fog. There is no evidence in the case before me indicating that it was even raining at the time of the occurrence, or that any rain which had been or may then have been falling had any effect upon visibility. The bridge personnel both heard and saw the vessel approaching. It was the visual observation by the Pilot of the vessel that the drawspan of the bridge was rising following the vessel's whistle signal that induced him to continue to approach the bridge with the intention of passing through the draw. Respondents' further reliance upon Section 192 of Title 33 of the United States Code is equally misplaced for support of respondents' contention that the provisions of that section were being violated because the vessel was not proceeding at a moderate speed.

Respondents rely upon Linde-Griffith Construction Co. v. The Authentic, 2 Cir., 1954, 210 F.2d 757, for support of their contention that in continuing to approach the draw despite her receipt of the two-blast warning signal or signals, the Lembulus acted in direct violation of the provisions of 33 C.F.R. 203.-200. In The Authentic case the bridge operator was exonerated because of the "glaring" fault of the tug which was towing the pile driver. In that case the tug blew the usual three-blast signal, which was answered by a two-blast signal from the bridge, forbidding the closer approach of tug and tow, because the span was being used by passing rail traffic. After traffic on the bridge had cleared, the draw span was raised to its normal elevation. The bridge tender then gave the tug the correct signal to proceed through the draw, but because of the improper handling of the tug, in shaping herself and her tow for passage of the draw, the pile driver collided with the opened leaf of the drawspan. It was not until the pile driver was actually passing through the draw that the inevitability of its contact with the bridge girder became manifest. It was then too late for the bridge tender to raise the drawspan through its additional three

degree range. In the case before me the issue of liability appears to be dependent upon the respective opportunities of the vessel and the bridge to avoid the collision which occurred. If, as the respondents contend, the bridge tender gave the signal warning to stand off because of the possibility of power failure, and if the vessel had heeded that warning, then when the bridge tender had succeeded in fully opening the draw he might be expected to give the prescribed "come-on" signal of three blasts, which would have permitted the vessel to pass through unharmed. On the other hand, the bridge commenced to open immediately following the vessel's signal, and continued to open, despite the two-blast signal or signals which the respondents claim were given. When the vessel was but a ship's length from the draw the span was observed to slow or stop, and although her engines were then driven full astern, it was too late for the vessel to avoid the contact with the bridge girder. See Clement v. Metropolitan Westside Elevated Railway Co., 7 Cir., 1903, 123 F. 271, 273; The Kard, D.C. 1930, 38 F.2d 844. In Connors Marine Co. v. New York & Long Branch R. Co., D.C.N.J.1949, 87 F.Supp. 132, no answer was given by the bridge tender to either of two signals from the vessel, whereupon her engines were slowed and then stopped, but due to wind and tide, she drifted out of shape for passage through the draw. The drawspan was ultimately opened, but in attempting to pass through the draw, the barge which was being towed by the vessel collided with the bridge abutment and was damaged. The Court there concluded that both bridge and tug were at fault, entitling the tug owner to contribution from the bridge owner. The failure of the bridge tender to give an answering signal invoked the Court's application of The Pennsylvania rule, supra, 86 U.S. 125, 22 L.Ed. 148.

In our case, the bridge draw was actually being operated by the respondent Peschken. While he did not personally see the approach of the Lembulus as she proceeded downstream, it was re-

ported to him by the respondent Hines, who, together with the respondent Bents, heard the vessel's three-blast signal of her intention to pass through the draw. This signal was also heard by Peschken when the vessel was over a nautical mile distant from the bridge. Peschken apparently started to open the draw promptly after receiving notification of the vessel's approach. However, when the draw section stopped in its ascent, or slowed to a point at which it appeared to have stopped, the bow of the vessel was then approximately her length away from the bridge abutment, and shaped for passing through the draw, at which time it first became apparent to her Captain that the topmasts would not clear. Whether, therefore, the bridge drawspan had actually stopped, or whether it had but slowed to an almost imperceptible speed, it was then too late for the vessel to avoid the collision, despite stopping her engines and then reversing their revolutions.

Respondents argue that the vessel contributed in the causation of her own damage by reason of the speed at which she approached the draw, in view of the conditions of weather, wind and tide prevailing at the time, and of the lightness of her lading. I have herein discussed at length the progress of the vessel from the Kopper's Wharf to the point of the collision. This consumed some ten minutes of time. The bridge tender testified to his awareness that the vessel was expected to come downstream by reason of the passage upstream earlier of the tugs to assist her. The bridge crew testified that they saw and heard the vessel approaching before she passed the Skyway bridge. If they were unable to accomplish the opening of the draw within that period of time, they were under the obligation of giving warning to the vessel in accordance with the governing regulations. Mr. Iannaccone testified that operation on the "third power point" required four minutes to fully open the draw, and that ten minutes would be ample time for lifting the span to its maximum height using either

958

the normal or the emergency controls for the purpose. It is uncontradicted that the vessel passed under the City bridge at 1546 hours and that her fore-topmasts struck the Lincoln Highway drawbridge span at 1557 hours. It is also uncontradicted that the distance between these two bridges is 1.1 nautical miles. Based on the vessel's bridge log, the master testified that after passing under the City bridge at 1546 hours the vessel's speed was dead slow ahead, and that at 1547½ hours she was given full ahead, harbor speed, or 9 knots. The witness further testified that it would take about ten minutes to build up to the 9 knots speed from a half ahead under the conditions existing at the time. At 1553½ hours, six minutes after her engines had been placed on harbor full ahead, their speed was reduced to slow ahead and dead slow ahead by immediately succeeding signals. The evidence is barren of any justification for assumption that the vessel had any reason to assume that the speed at which she was approaching the draw could involve any risk of the developments which occurred. I find that by commencing the raising of the drawspan immediately following his "warning" signal, the physical raising of the bridge countered the effect of such warning, and served as an invitation to the vessel to proceed. See Clement and The Kard, supra. I can, therefore, find no basis for concluding that the vessel contributed in bringing about the collision, and am unable to relieve the drawbridge operator of responsibility for the occurrence.

There remains the question of the liability of the respondents Hines and Bents to the libelant. While it is true that these two respondents were, with Peschken, employees, and therefore agents or servants of the bridge owner, I can find in the evidence no basis for concluding that any act or omission on the part of, or chargeable to Hines or Bents contributed in the causation of the collision. Each of the three respondents had certain functions to perform in the opening of the span, and the responsibility for the giving of signals to approaching vessels and for operating the lift mechanism of the drawspan appears to have rested exclusively upon Peschken. Therefore, there is but one claim in this case, namely, that of the vessel against Peschken. No liability has been proven against Hines or Bents.

The negligence which I find solely responsible for the collision was that of Charles Peschken alone. A decree may be entered in favor of the libelant and against the respondent Charles Peschken only, for such damages as libelant may prove, in accordance with the applicable Admiralty practice of this Court, and for its costs herein. Judgment may be entered for the respondents Canolius v. Hines and Fred W. Bents against the libelant for their costs.

This opinion shall constitute my findings of fact and conclusions of law. Let judgments be entered accordingly.