The **PENNSYLVANIA RAILROAD COMPANY**, Libellant,

v.

**S.S. MARIE LEONHARDT**, her engines, tackle, apparel, and furniture, and against all persons intervening and their interest in the same, Claimant.

**LEONHARDT & BLUMBERG** of Hamburg, Germany, as owner of S.S. Marie Leonhardt, Cross-Libellant,

v.

The **PENNSYLVANIA RAILROAD COMPANY**, Cross-Respondent.

No. 13 of 1959.

United States District Court
E. D. Pennsylvania.

Jan. 30, 1962.

See also 179 F.Supp. 437.

Thomas C. McGrath, Jr., and Philip Price, of Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., proctors for libellant and cross-respondent.

Richard W. Palmer, and Henry C. Lucas, III, Philadelphia, Pa., of counsel, of Rawle & Henderson, Philadelphia, Pa., proctors for claimant and cross-libellant.

CALEB M. WRIGHT, District Judge.

Libel *in rem* filed by the Pennsylvania Railroad against the S. S. Marie Leonhardt. Answer and cross-libel *in personam* filed against the Railroad by Leonhardt & Blumberg, claimant and owner of the vessel. Each party avers that the other was solely at fault in causing the vessel to collide with the Delair drawbridge on the Delaware River, which is operated and maintained by the libellant Railroad. The libel alleges negligent and improper navigation of the vessel as it approached the bridge; the answer and cross-libel deny negligence in the navigation of the vessel, alleging the collision to be solely attributable to the negligent operation of the drawbridge by the Railroad and its agents. Both libel and cross-libel contain appropriate prayers for damages suffered as a result of the collision. Jurisdiction to entertain the cause is conferred by 46 U.S.C. A. § 740.

Shortly after 11:30 a. m. on January 9, 1959, the Marie Leonhardt departed from Pier 122, South, on the Delaware River at Philadelphia with a cargo of bulk iron ore and proceeded upriver towards her destination at the Fairless Steel Works at Morrisville, Pa.[1] Her draft was 23'-6" even keel.[2] Present on the navigating bridge of the vessel were Pilot Rutherford, the ship's master Henkel, a helmsman, a mate, Lieutenant Johnson and Commander Porter.[3] Porter and Johnson, officers of the United States Coast Guard, were aboard the vessel to make an inspection of conditions upriver.[4] The day was clear; the wind from the northwest at 22 knots with gusts up to 27. The tide was flooding with a current estimated at 2 knots.[5] The tug Joan McAllister accompanied the vessel upstream.[6] Pilot Rutherford was in possession of a portable radiotelephone receiver-transmitter.

The Delair Bridge spans the Delaware River between Delair, New Jersey, and Philadelphia. It is equipped with a rotary drawspan, which was revolved 90° counter clockwise to permit the attempted passage of the Marie on the day in question.[7] Walter Dougherty was on duty as drawtender in the shanty on the movable span, and Charles Howell was the block operator situated in the Jersey Tower at the easterly end of the bridge.[8] Dougherty operated the machinery to activate the movable span by means of controls in his shanty, but before this was possible it was necessary for the tower operator to electronically release the drawspan.[9] The bridge was equipped with a radiotelephone located in the tower and operated by Howell.[10] A telephone line between tower and drawtender's shanty enabled Dougherty and Howell to communicate. Radio communication between the drawtender and approaching vessels was impossible because the bridge radio was located in the Jersey Tower.[11] The tower operator communicated with the dispatcher at the 30th Street Station (Philadelphia) by another telephone line; permission to open the draw was secured from the dispatcher before the tower operator re-

1. Rutherford, N.T. 412–413; Henkel, Dep. *de bene esse*, pp. 13–15; Quandt, Dep. *de bene esse*, pp. 3–4.

2. Henkel, Dep. *de bene esse*, p. 13; Rutherford, N.T. 421.

3. Porter, N.T. 607.

4. See note 19, infra.

5. Porter, N.T. 606–607; Henkel, Dep. *de bene esse*, pp. 17–18.

6. Rutherford, N.T. 417–418, 421; Henkel, Dep. *de bene esse*, p. 18. The sole reason for the tug's presence was to assist the vessel in docking at Morrisville; hence the tug simply remained in the general vicinity of the Marie in the course of the passage upriver, as was customary. Rutherford, N.T. 418; Henkel, Dep. *de bene esse*, p. 47.

7. Dougherty, N.T. 178, 181–182; see Exhibit C–35.

8. Howell, N.T. 3–5, 14; Dougherty, N.T. 133–134.

9. Howell, N.T. 37–38; Dougherty, N.T. 136–137.

10. Howell, N.T. 11; Dougherty, N.T. 222.

11. Howell, N.T. 105; Dougherty, N.T. 163.

leased the movable span to the drawtender.[12]

The following factual issues are the subject of sharp disagreement between the parties:

1) Precisely when the pilot first notified the bridge by radiotelephone of the presence of the vessel and his intention to transit the draw; whether this first call was answered by Howell in the tower.

2) How many, if any, radiotelephone communications between the pilot and tower operator occurred subsequent to the first.

3) Whether whistle signals were sounded by the vessel.

4) The time at which the drawspan began to open; the time when it was fully opened.

These form the crux of the disputed facts. Testimony of the various witnesses is in irreconcilable conflict concerning these and related factual issues.

The court finds that the pilot first informed the bridge of his presence and intention to transit the draw at 12:26, when in the vicinity of Port Richmond.[13] Upon receipt of this call, the tower operator promptly notified the drawtender.[14] Whether the tower operator responded to this call and apprised the ship of the anticipated arrival of a scheduled westbound passenger train at 12:31 is a subject of controversy [15] which need not be resolved in view of subsequent events.[16]

The tower operator testified that no subsequent radio communication between himself and the vessel occurred until sometime after the collision; [17] testimony of those aboard ship directly contravenes this statement.[18] In evaluation of the testimony of various witnesses, the court has found that of the Coast Guard officers most persuasive. Commander Porter and Lieutenant Johnson were wholly disinterested witnesses whose very purpose in making the voyage was to closely observe and record all incidents of the vessel's upriver passage.[19] The court has therefore relied heavily on their statements to resolve conflicting factual testimony.

12. Howell, N.T. 100–102; Kane, N.T. 352–357.

13. The testimony of the pilot (N.T. 421, 422, 471–472) shows that such a call was made and the deposition testimony of the master, W. Henkel, confirms that the pilot's first call was made sometime prior to 12:30 (pp. 19–20), somewhat upriver from the Ben Franklin Bridge. Neither Lieutenant Johnson nor Lieutenant Commander Porter observed the pilot making this call, but tower operator Howell testified that the ship's first call was received at 12:26, and this is borne out by the log of radio communications kept in the tower (Ex. C–11) by the operators in the regular course of duty (N.T. 72–73). The drawtender confirmed that he was notified of the vessel's presence by Howell at 12:26 and then noted its position off Petty's Island, opposite Port Richmond (N.T. 134). Howell observed the vessel in the same location at 12:26 (N.T. 40).

14. Howell, N.T. 14; Dougherty, N.T. 134.

15. Compare Howell, N.T. 11, with the general testimony of Rutherford, Henkel, Porter and Johnson on this point. Rutherford denied that any response to his first call was made by the bridge (N.T. 422).

16. As will appear infra, the train was late and the ship was definitely notified of its expected belated arrival in the subsequent communication at 12:34. In view of these later developments, the sole import of the 12:26 call was that the bridge personnel were apprised of the vessel's presence and intent to transit the draw.

17. N.T. 12.

18. See particularly the testimony of Johnson, N.T. 637 et seq.

19. Porter's purpose was somewhat more limited than Johnson's. Porter was particularly interested in the operations of a drill barge upriver which was working with explosives (N.T. 604–605). Johnson was present to specifically observe the progress of the ore vessel upriver (N.T. 636). He kept a precise record of events in accordance with his duty (N.T. 637, 646).

Accordingly, the court finds that the pilot radioed again at 12:34,[20] when the vessel was some 2100 yards below the bridge, and was advised by the tower operator in response that an approaching train would necessitate a three minute delay in opening the draw.[21] The pilot made no reply to this communication by the bridge.[22] From this point the ship moved at the slowest possible rate, favoring the Pennsylvania side of the channel[23] in its approach to the draw; her engines were stopped except for momentary "slow ahead" bells to maintain proper position of her bow in the channel.[24] The average ground speed of the vessel thereafter was estimated at 4 to 6 knots.[25] Throughout the approach the vessel appeared to respond properly, with prompt, accurate execution of the pilot's engine orders and rudder commands.[26]

The two car train, some 4 or 5 minutes behind schedule, cleared the movable span by 12:36,[27] at which time the vessel was some 1200 yards from the bridge.[28] Having observed its passage, Pilot Rutherford again contacted the bridge by radiotelephone at 12:39[29] with the ship about 1000 yards[30] from the closed draw and moving steadily nearer. The tower operator responded that the bridge was opening,[31] although at this time no movement of the drawspan was observed by the personnel on the navigating bridge of the vessel.[32] Shortly thereafter, about 12:40, the ship blew three blasts on its whistle. No whistle or horn signals were sounded by the bridge in response.[33] At 12:40 the ship was a short distance downstream from an anchorage ground on the Pennsylvania side of the channel,[34] which is somewhat less than a half mile from the bridge.[35] Prior to the establishment of radiotelephone communications, upriver pilots customarily used this anchorage in the event the bridge failed to respond

20. Johnson, N.T. 637. All times hereinafter appearing in the text of this opinion are taken from Lieutenant Johnson's recorded observations based on the ship's bridge clock (N.T. 661).

21. Johnson, N.T. 662–664; Rutherford, N.T. 425–426 (call made at the beginning of Fisher Point Range; cf. C. & G.S. Chart #280, Ex. C–3–CA).

22. Johnson, N.T. 664–665.

23. The vessel was thus held to windward as is customary (Rutherford, N.T. 444, 499). Favoring the Pennsylvania side also facilitated a turnabout in the event such maneuver became necessary, at the farthest possible location upstream, about a half mile from the bridge (Rutherford, N.T. 522, 534–544). See notes 34–37, particularly note 36, infra.

24. Rutherford, N.T. 426–432; Porter, N.T. 618; Johnson, N.T. 646. Ex. C–21–A through D (Engine Bell Book).

25. Porter, N.T. 618; Johnson, N.T. 659; Rutherford, N.T. 436.

26. Rutherford, N.T. 569–571; Porter, N. T. 607–608; Johnson, N.T. 646–647, 657–658.

27. Howell electronically released the drawspan at 12:36 (N.T. 30, 39). Dougherty testified that the train passed his shanty on the movable span at 12:35 (N.T. 135–

136). Lt. Johnson noted that it had crossed the drawspan and nearly reached the Pennsylvania shore by 12:37. It may therefore be deduced that the train cleared the movable span by 12:36.

28. Johnson, N.T. 665.

29. Johnson, N.T. 638.

30. Johnson, N.T. 665–666. Compare testimony of Rutherford, N.T. 433–434, 474, and Porter, N.T. 612. See in this connection Ex. C–3–C, from which it appears that the intersection of Fisher Point Range and Fisher Channel is approximately 1000 yards distant from the bridge measured down the centerline of the channel.

31. Johnson, N.T. 638; Porter, N.T. 612.

32. Rutherford, N.T. 438; Porter, N.T. 613; Johnson, N.T. 644.

33. Rutherford, N.T. 438, 546; Porter, N.T. 616–617; Johnson, N.T. 642–643. The drawtender's shanty was equipped with a whistle to respond to these signals.

34. Rutherford, N.T. 522, 534–544, 541; Porter, N.T. 617. See note 23, supra.

35. Porter, N.T. 616–617. Rutherford, N. T. 522, 534–544; Rutherford referred only to that portion of the restricted anchorage area upstream from the location where the depth is eighteen feet. See Ex. C–3–C.

to whistle signals and remained unopened. Hence this location was termed in testimony as the "cutoff point".[36] Rutherford considered anchoring here in the absence of response to the whistle signals sounded by the vessel, but abandoned this plan and continued to proceed in view of the previous assurance by the tower operator over the radiophone that the bridge was opening.[37] The pilot gave close attention to the drawspan after the 12:39 conversation, yet it remained closed.[38]

Confronted at 12:42 with the unopened bridge some 300 yards distant,[39] the pilot took the admittedly drastic action of dropping the starboard bow anchor with 90 feet of chain. The ship's engines were placed full astern. The tug Joan McAllister was summoned to push on the port bow of the Marie. Simultaneously, the drawspan began to open.[40]

Immediately prior to the release of the anchor and reversal of the engines, the vessel was reasonably well shaped up to negotiate the draw, though somewhat cocked on the Pennsylvania side of the channel with its bow farther towards New Jersey than its stern. The force of the tidal current was consequently on the starboard quarter.[41] The pilot had intended to place the vessel in the proper position to transit the draw by turning slightly to starboard, back to midship and thence to port.[42] This intended maneuver was thwarted by the extended anchor and the engines developing sternway; the reversed screws caused the stern to back more to port while the anchor, tug, and forward motion brought the bow more to starboard, thereby swinging the vessel further askew in the channel.[43] It was momentarily considered to deploy the tug farther astern to counteract this tendency, but this was immediately rejected as infeasible because of time limitations; the tug was thus ordered to resume pushing at the previous location on the port bow.[44] The current worked to steadily worsen the

36. Johnson, N.T. 688; Rutherford, N.T. 540 et seq., 561. The turnabout area and "cutoff point" are one and the same (e. g. Rutherford, N.T. 540–544). In turning about from an upstream heading on a floodtide, the pilot must employ the ship's anchor (see particularly Rutherford, N.T. 541–542). Further details of this procedure appear in the testimony of Quistgaard, an expert navigator called by claimant (N.T. 766–767).

37. N.T. 544–545, 561–563.

38. Rutherford, N.T. 575–576. See note 32, supra.

39. Rutherford, N.T. 440–441, 443, 503. Rutherford was uncertain as to whether the vessel was two or three shiplengths from the bridge at this time (N.T. 515–516). Johnson estimated this distance as 300 yards (N.T. 638), which roughly equals Rutherford's estimate of two shiplengths, since the vessel is 522'–9" long (Ex. C–1–A).

40. Rutherford, N.T. 441–443, 503–505, 550–553; Porter, N.T. 613–614; Johnson, N. T. 638, 644.
An additional radio communication occurred in connection with the release of the anchor; this was characterized by Lt. Johnson as a "running conversation" (N. T. 650). Testimony of Porter and Johnson is in conflict on the question of whether this conversation began immediately prior to dropping the anchor or immediately thereafter. Compare N.T. 650 with N. T. 612–613. Rutherford's testimony tends to corroborate that of Porter, indicating that this conversation began before release of the anchor. N.T. 440–441. The gist of the bridge's reply in this conversation was again that the bridge was opening.
The slight discrepancy as to the chronology of this communication is of no consequence. If the conversation occurred after the release of the anchor, it could have had no effect in the pilot's decision to pursue this course of action. If it preceded the release of the anchor, it could not have appreciably altered the pilot's decision in this connection, since the conversation was no more than a reiteration of the information previously conveyed by the tower operator at 12:39. The sole importance of this conversation is its consistency with its predecessors.

41. Rutherford, N.T. 454, 526, 567; Johnson, N.T. 648.

42. N.T. 442–444, 518–519, 527–528.

43. Rutherford, N.T. 444–446, 451–452, 513–515, 527–528; Porter, N.T. 614–615.

44. Rutherford, N.T. 452, 528–529; Porter, N.T. 614; Johnson, N.T. 688–689.

vessel's position.[45] The bow actually entered the draw, but the ship backed off as more sternway developed.[46] The drawspan had begun to open at 12:42 when the anchor was dropped and was fully open at 12:43½.[47] As the vessel's position steadily worsened, the pilot abandoned all notions of transiting the draw. Believing collision inevitable, he ordered the engines emergency full ahead with the ship some 75 yards from the bridge.[48] At 12:45 the bow of the Marie rammed through the wooden fender rack surrounding the pier between the drawspan and the adjoining fixed span to the west, becoming wedged therein. With her bow thus constrained, her stern swung towards the fixed span. By placing her rudder to port with her engines yet full ahead, the angular velocity of the swing was reduced, thereby cushioning the impact of the stern. The port quarter of the vessel settled against the fixed span to the west of the draw at 12:48.[49] There is no doubt that had the bridge opened more promptly, the pilot could have successfully negotiated the draw.[50]

The regulations governing the operation of the Delair Bridge appear in 33 CFR § 203.227 (1949).[51] The relevant portions provide:

"(a) * * * When at any time during the day or night any vessel, tug, or other watercraft unable to pass under a closed drawbridge approaches it with the intention of passing through the draw, the signal for the draw to be opened shall be three blasts of a whistle or horn blown on the vessel or craft. If the draw is ready to be opened immediately when the signal is given on the vessel or craft, the signal shall be answered by two blasts of a whistle or horn blown on the bridge; if the draw is not ready to be opened immediately, the signal shall be answered by one blast of a whistle or horn blown on the bridge.

"(b) *Opening the draw.* Upon hearing or perceiving the prescribed signal, the bridge tender shall immediately clear the drawspan and open the draw to its full extent for the passage of the vessel or oth-

---

45. Rutherford, N.T. 444, 513, 559; Porter, N.T. 614.

46. Exhibit L-10-D; Rutherford, N.T. 511, 554-556. The engines were ordered double full astern when the anchor was dropped at 12:42, thence stopped momentarily at 12:44 after the bridge was perceived to be opening (Rutherford, N.T. 505-507, 560; Porter, N.T. 625; Johnson, N.T. 667). They were then placed on full astern again until 12:45 or 12:46 when a full ahead order was given in preparing to ram the fender rack (Rutherford, N.T. 445-447, 531-533; Porter, N.T. 615, 625, 628; Johnson, N.T. 667). These engine orders are borne out by the Engine Bell Book, Ex. C-21-A, B, C, and D, maintained in the engine room in the regular course of operation as a record of activities in accordance with orders (Henkel Dep. *de bene esse* p. 12; Bohnsack Dep. pp. 367-368). Times appearing in this log are consistently about four minutes behind the actual time of these events, because the engine room clock lagged four minutes behind the clock on the vessel's bridge (Johnson, N.T. 645, 661, 686-687; Henkel Dep. pp. 43-44, 101-103).

47. Rutherford, N.T. 443, 505, 550-553; Porter, N.T. 613; Johnson, N.T. 638, 645.

48. Rutherford, N.T. 505-531; Porter, N.T. 614-615; Johnson, N.T. 638-639. Cf. note 46, supra.

49. Exhibits L-10-G, L-10-A through C, L-10-E; Rutherford, N.T. 447-448, 457, 533; Porter, N.T. 615; Johnson, N.T. 638-641; see also the Engine Bell Book, Ex. C-21-A through D, and note 46, supra.

50. Rutherford, N.T. 567-568, 572-573, 577; Porter, N.T. 621; Johnson, N.T. 650, 655; Quistgaard, N.T. 768-769. Estimates on the time at which the bridge would have to have been opened to permit successful transiting the draw vary from "a couple of minutes" (Porter, N.T. 621; Johnson, N.T. 650, 655) to something in excess of 30 seconds (Rutherford, N.T. 577).

51. Promulgated by the Army Corps of Engineers pursuant to authority delegated to the Secretary of the Army in 33 U.S. C.A. § 499. This same statutory provision provides that these regulations "shall have the force of law".

er craft: *Provided,* That the draw of a railroad bridge need not be open when there is a train in the bridge block approaching the bridge with the intention of crossing, nor within 5 minutes of the known time of passage of a scheduled passenger, mail, or express train; but in no event, except in case of breakdown of the operating machinery, shall the opening of the draw be delayed more than 5 minutes in the case of a highway bridge nor more than 10 minutes in the case of a railroad bridge * * *."

These regulations are silent as to the effect of radiotelephone communications. Improved navigational facilities for ore ships on the Delaware River became necessary with the opening of the Fairless Steel Works at Morrisville in 1953. Upriver inspection trips by representatives of the Coast Guard, Army Engineers, Pilots' Association and shipping interests resulted in improvement of range markers and buoy locations. The Coast Guard additionally suggested that radiotelephone communications be established between drawbridges and oreships. Wind conditions often severely limited the audible range of whistle or horn signals; the rapid Delaware River current compounded this navigational difficulty. The radiophone communications were intended to mitigate this hazard. Installed in 1954, it quickly became customary for oreboats to communicate with the bridges by radio;

both relied on this method to govern their respective operations in the passage of oreboats through the draws. Radio communications were never intended to supersede the prescribed whistle or horn signals; the former were to supplement the latter.[52] Neither the Coast Guard nor the Army Engineers participated in the negotiations which led to the establishment of radiotelephone communications.[53]

Maritime collision liability is predicated upon fault causally related to the accident. This presupposes the existence of ascertainable standards of conduct, deviation from which—in the absence of a legally recognizable excuse—results in a finding of fault and consequent imposition of liability.[54] These standards are derived from three sources, each of which may supplement the others. First and most definite are the statutory rules enacted by Congress, or those regulations promulgated by federal agencies in accordance with a delegation of legislative power.[55] The second source of standards, less precise than statutory rules, are the dictates of custom.[56] Third and last, though often first in point of historical development, are the demands of reasonableness and prudence. Much the same as in some areas of civil tort law, participants in the maritime industry are held accountable for the foreseeable consequences of their activities. Taking due account of the surrounding circumstances, unreasonable or imprudent conduct constitutes fault from

52. Dougherty, N.T. 161, 221–225; Rutherford, N.T. 540–545; Skelton, N.T. 824–825, 829, 839–841, and, e. g. Stipulation, document No. 16 in Court File No. 34.

53. The formal agreement to install radio communications in the Delair Bridge was executed by the Pennsylvania Railroad and Isthmian Steamship Company (see the Stipulation in note 52, supra). Though never formally notified of the use of radiotelephones on these bridges, the Army Engineers had actual notice and knowledge of the practice; the Engineers assumed that the radios were employed as supplementary aids to the prescribed whistle or horn signals. (Kreh, N.T. 731–732).

54. The terms "fault" and "negligence" are often used interchangeably. See Gilmore and Black, The Law of Admiralty, §§ 7–2 to 7–6 (1957) and cases cited therein.

55. State rules and regulations, so long as they do not contradict federal law, also fall into this category. Id. at § 7–3.

56. Maritime customs vary in frequency and complexity in different geographical regions; their development and continued existence are usually manifestations of a response to a peculiarly local situation. It is hornbook law that custom may not contravene statutory regulation. Id. at § 7–13.

which liability for collision will ensue.[57] The admiralty courts have fashioned relatively clear rules governing the conduct of maritime activities wherein collision hazards exist.

■■■ In the situation of a ship approaching a drawbridge, the danger of collision is obvious. Considerations of reason and prudence have led the courts to conclude that one who erects a low slung bridge over a navigable waterway is held to foresee that the span will interfere with navigation. A bridgeowner must therefore equip the bridge with a movable span and with machinery adequate to promptly open it. Competent personnel must be provided for the operation and maintenance of this equipment. Prompt and correct responses must be accorded signals sounded by approaching vessels desirous of passage.[58]

■■■ The maritime tribunals view bridges as obstructions to navigation. The right of navigation is paramount; land traffic over the bridge is subservient thereto. Hence the rule has evolved that in approaching a drawbridge a ship having sounded proper signal may proceed on the assumption that the draw-

span will be timely opened; the vessel is under no duty to heave to and critically examine the situation to satisfy itself that the drawspan is operating properly. This is not to say that a master may heedlessly steer the ship into a closed draw, but he may approach carefully on the assumption that the duties imposed upon the bridge personnel will be performed in timely fashion in the absence of a signal from the bridge to the contrary.[59] This assumption may be reinforced or rendered nugatory by inferences which the courts in retrospect hold that a pilot should have reasonably drawn from additional circumstances surrounding the approach of the vessel. Hence the right of the ship to attempt passage becomes well-nigh absolute when bridge personnel, by means of affirmative conduct, extend what the maritime tribunals deem an invitation to proceed in response to the vessel's signals.[60] Variation of the operative facts may produce wholly different results: the assumption that the bridge will be timely opened can be negated by inference to the contrary which a prudent pilot should derive from particular circumstances of the vessel's approach.[61] A closed draw-

57. Note 54, supra.

58. E. g.: Munroe v. City of Chicago, 194 F. 936 at 937–938 (7 Cir. 1912), cert. denied, 229 U.S. 609, 33 S.Ct. 464, 57 L.Ed. 1350 (1912) ; Clement v. Metropolitan West Side El. Ry. Co., 123 F. 271 at 273 (7 Cir. 1903) ; and note particularly the controlling decision of the Third Circuit, The Bellatrix, 114 F.2d 1004 at 1006 (1940).

59. See Munroe v. City of Chicago and The Bellatrix at note 58, supra. The Third Circuit Court of Appeals recently acknowledged this rule by way of dictum in Shell Petroleum Co. Ltd. v. Peschken, 290 F.2d 685, at 687 and f. n. 1 (1961).

60. The clearest invitation to proceed is when the bridge replies with a prescribed signal to the effect that the draw will open seasonably to accommodate the vessel's passage. The Eureka, 80 F.2d 303 (9 Cir. 1935). An invitation to proceed derived by way of less compelling inference from surrounding circumstances is best understood by way of illustrative ex-

ample. In The Louise Rugge, 239 F. 458 (3 Cir. 1917), a tug with derrick lighter in tow approached a bridge on a clear night and signalled for opening. The bridgetenders did not customarily signal in response and none was forthcoming from the bridge on this occasion. But the lights on the bascule span moved upwards and thence stopped, indicating that the bridge had opened. In fact the bascule span was but partially raised. It was held that these events constituted an invitation to proceed and that the vessel was justified in approaching in view of the observed motion of the lights. Liability for damage to the derrick resulting from collision with the partially opened span was imposed exclusively upon the bridge owners. See also The Kard, 38 F. 2d 844 (D.C.E.D.Pa.1930) ; City of Chicago v. Mullen, 116 F. 292 (7 Cir. 1902).

61. Compare The Louise Rugge, op. cit. supra, with Great Lakes Towing Co. v. Masaba S. S. Co., 237 F. 577 (6 Cir. 1916), wherein a steamer in the tow of two tugs collided with a partially raised bascule span in broad daylight, proper signals

bridge without more—or the display of a visual signal indicating that the draw is closed—does not suffice to serve notice upon the pilot or master of an approaching vessel that it will not be timely opened.[62] The viable standards of reason and prudence, applied to the totality of circumstances, determine the allocation of fault in each instance.

The Army Engineers regulation comprises the core of the standards of care applicable to the present case. The Third Circuit Court of Appeals recently admonished[63] that strict adherence to the terms of such enactments is required. Violation of any provision therein will invoke the rule of The Pennsylvania:

" * * * The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was

not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. * * * "[64]

The court is of the opinion that the vessel committed no violation of the regulation in its approach. The ship blew the prescribed whistle signals once when immediately below the cutoff point at 12:40. The bridge did not respond with like signals. The vessel could have repeated this signal at a point farther upstream, closer to the bridge, but the pilot dispensed with this in view of the previous assurance by radiotelephone that the bridge would open. Under the circumstances, the once-blown signal was literal and sufficient compliance with the regulation. The Pennsylvania rule is therefore inapplicable to the navigation of the ship.[65]

The proctor for the libellant railroad urges that the vessel violated another statute, the "narrow channel" rule,[66] by proceeding upriver on the portside of the range. He would have the court invoke The Pennsylvania rule against the ship as a consequence. This argument is readily rebutted. The "narrow channel" rule is designed to prevent collisions between vessels on inland wa-

---

having been sounded beforehand. The court found the navigation of the tugs imprudent because of the failure to verify that the span was fully raised before the attempted transit of the draw. The bridge operators were held concurrently at fault for neglecting to raise the drawspan to its full height.

The pilot must draw upon his own knowledge, as well as observing the general dictates of prudent seamanship, in evaluating the circumstances. Cf. The No. 9, 258 F. 693 (D.C.D.Del.1919).

62. The Majestic, 80 F.2d 879 (4 Cir. 1936) ; Munroe v. City of Chicago, 194 F. 936 (7 Cir. 1912). Where a municipal ordinance forbade vessels to attempt transit of a draw unless a red ball was raised, the absence of this signal did not serve to negate the assumption, properly drawn under the circumstances, that the drawspan would be seasonably opened. Display of this signal would have conveyed no more in this connection than

the unopened bridge itself. City of Cleveland v. McIver, 109 F.2d 69 (6 Cir. 1940).

63. Shell v. Peschken, note 59, supra. The Sixth Circuit Court of Appeals previously held The Pennsylvania rule applicable in a similar context. Dorrington v. City of Detroit, 223 F. 232 (1915). See also Conners Marine Co. v. New York & Long Branch R. Co., 87 F.Supp. 132 (D.C. N.J.1950).

64. The Pennsylvania, 19 Wall. 125, 86 U. S. 125 at 136, 22 L.Ed. 148 (1873).

65. It is to be noted that the regulation of the Army Engineers does not purport to govern the use of radiotelephones. The maximum delays permitted therein might well be altered somewhat to correspond to the greater range of radio, though the court deems it unnecessary to consider this problem.

66. 33 U.S.C.A. § 210 ; Art. 25 of the Inland Rules.

terways, rather than collisions involving a ship and a bridge. This suffices to render the rule inapplicable to the present situation. Even assuming arguendo that it applies to a lone ship approaching a bridge, the rule is self-restrictive to instances wherein compliance is "safe and practicable." In moving up the portside of the channel, the Marie was held to windward as is customary. This also facilitated a turnabout at the cutoff point, in the event such a maneuver became necessary.[67] These considerations would suffice to justify departure from the rule in the event it was applicable, since compliance was impracticable.[68]

■ In further examination of the management of the vessel, construction of the Army Engineers regulation beyond the determination of an absence of statutory fault is unnecessary. Compliance with the statute was had; little additional aid is derived from the regulation since it is silent on the effect of radio signals, a crucial element in this case. The demands of custom and prudence supplement the regulation, imposing standards which must also be observed.[69] The absence of statutory violation makes these latter standards determinative of the question of fault on the part of the vessel.

■ In accordance with prevailing custom on the upper Delaware, the pilot resorted to radio communication with the bridge. When advised at 12:34 of the imminent crossing of the train, the vessel immediately slowed and thereafter proceeded towards the bridge at the slowest possible rate. The pilot was informed at 12:34 that the train would necessitate a two or three minute delay in opening the draw. The train was observed to clear the drawspan by 12:36; in response to the pilot's additional radiotelephone query at 12:39, the tower operator replied that the draw was opening. Viewed against the 12:34 conversation, the passage of the train, when coupled with the assurance at 12:39, constituted an invitation to proceed. It is difficult to conceive of a more explicit invitation than a direct communication apprising the pilot that the bridge was opening.[70] The pilot reasonably inferred from this sequence of events that the drawspan would be timely opened to permit the vessel's passage. At no time after the passage of the train did the tower operator give any indication of further delay.[71] The failure of the drawtender to respond to the whistle signal cannot be held to negate the strong invitation previously extended. Lack of response to the whistle, with nothing more, would give rise to the assumption that the bridge would open seasonably. Munroe v. City of Chicago and The Bellatrix, note 59, supra. It

---

67. Notes 23, 34–37, supra. The channel was devoid of other ships as the Marie approached the bridge (N.T. 471–472). The northwest wind on the port quarter tended to push the entire ship laterally towards the leeward Jersey shore. The ship travelled up the port (Pennsylvania) side of the channel to compensate for this effect (N.T. 498).

68. Cf. The Three Brothers, 170 F. 48 (2 Cir. 1909); Circle Line Sightseeing Yachts, Inc. v. City of New York, 283 F. 2d 811 (2 Cir. 1960), cert. denied, 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191 (1961).

69. " * * * The regulations of the War Department [subsequently designated the Department of the Army by § 205(a) of the Act of July 26, 1947, c. 343, Title II, 61 Stat. 501, 5 U.S.C.A. § 181–1] do not purport to set the ultimate standard of care in civil actions; and in the absence of a preemption of this function by the department, the courts must determine the standard of care in this civil action. * * * " Oregon-Washington Bridge Co. v. The Lew Russell, 196 F.2d 707, 709 (9 Cir. 1952).

70. Cf. The Eureka, note 60, supra.

71. Shell v. Peschken, note 59, supra, indicates that no invitation to proceed can be found from the opening of the drawspan when the bridge had previously signalled that a delay would ensue. In such circumstances the ship must hold back until affirmatively signalled to come forward. Here the only indicated delay was one of 2 or 3 minutes for the passage of the train. The train's crossing and the 12:39 assurance strongly inferred that no further delay was anticipated.

would seem to follow a fortiori that failure to respond to the whistle signal could not serve to negate the previously extended invitation to proceed under the circumstances.[72] The court is therefore of the opinion that the pilot's decision to proceed beyond the cutoff point was entirely reasonable. To attach fault to this phase of the vessel's upriver navigation would in effect be a determination that prudence and reason demanded that the substance of the radiotelephone conversations be ignored—a result wholly at variance with prevailing custom.

At 12:42 the ship found itself in a position of imminent peril, solely because of its reliance on the observed passage of the train and the misleading radio conversations. The proximity of the vessel to the unopened bridge created an emergency. ·The pilot's decision to release the starboard bow anchor, his deployment of the tug, and the vessel's maneuvers subsequently have been repeatedly assailed as imprudent throughout the course of trial. No proof has been offered in support of these contentions. To the contrary, the unrebutted testimony of claimant's expert navigator—predicated substantially on the facts as set forth at the outset of this opinion [73]—stands as retrospective confirmation that the navigation of the vessel was at all times prudent. The court finds this testimony persuasive, and concludes that the navigation of the vessel complied with the dictates of prudent seamanship throughout its approach. Even if the management of the vessel beginning with release of the anchor and thereafter was found to fall short of the demands of prudent navigation, no liability would ensue. Navigational errors of judgment in the face of an emergency do not give rise to a finding of negligence. The Bellatrix, note 73, supra. Here the emergency of seemingly imminent collision was brought about through no fault of the vessel. The pilot, a competent seaman, acted to the best of his ability in taking measures to alleviate the situation. The law requires no more under the circumstances.[74]

Two final arguments advanced by the libellant with respect to the vessel's approach must be considered. First, it is urged that a presumption of negligence arises generally in admiralty when a moving vessel strikes a fixed object, and that this applies to the case at bar. The short answer to this contention is that the Third Circuit has refused to apply this presumption in situations involving a ship colliding with a bridge.[75] Finally, libellant contends that the doctrine of last clear chance [76] should be applied to the vessel's approach, with the result that liability for damages arising from the collision be imposed exclusively upon the ship. Application of last clear

---

72. A much more reasonable inference would be that the whistle signals were simply not heard. Such was the testimony of the bridge personnel (N.T. 111, 188). This accords with the past experience of inaudibility of such signals in this region because of strong winds. Note 52, supra, and accompanying text.

73. N.T. 758–812. This testimony was provisonally admitted at trial, pending later determination by the court on the question of admissibility. The court is satisfied that Quistgaard's qualifications attest to his competence to testify in this area (N.T. 758–761). Admissibility of competent expert testimony on the prudence of navigation is tacitly recognized in The Bellatrix, 114 F.2d 1004, 1007 (3 Cir.

1940). Accordingly, the court rules the testimony of Quistgaard admissibile.

74. Cf. The Eureka, 80 F.2d 303, 306 (9 Cir. 1935); City of Cleveland v. McIver, 109 F.2d 69, 72 (6 Cir. 1940). Another circuit has applied the closely related *in extremis* rule to reach the same result. Munroe v. City of Chicago, 194 F. 936, 939–940 (7 Cir. 1912).

75. The Bellatrix, note 73, supra, at 1006.

76. "* * * This doctrine, which usually is justified only by vague statements in terms of 'proximate cause', places its emphasis upon the time sequence of events, and holds the defendant liable if, immediately prior to the harm, he has the superior opportunity to avoid it. * * *" Prosser, Law of Torts, § 52 (2nd Ed. 1955).

chance to the instant facts would do violence to the doctrinal rules governing the duties of bridges and ships, when the latter approach the former. Its effect would be to negate both the assumption, when properly drawn, that the bridge will seasonably open and the legal effect of the invitation to proceed, since its application assumes that the vehicle or ship in motion has the "superior opportunity to avoid * * * [the impending harm] * * *." [77] The court therefore rejects the applicability of this doctrine to the present situation.[78]

■ Accordingly, the court finds that it was prudent for the vessel to proceed upriver under existing conditions,[79] and that it was without fault throughout its approach to the bridge. Hence the ship is not liable for damages resulting from the collision.

■ Once apprised of the vessel's intent to negotiate the draw at 12:26, those in charge of the bridge had an affirmative duty to open the drawspan to its fullest extent at a time sufficiently in advance of the ship's arrival so as to assure the pilot of safe passage. In the event a timely opening of the draw proved impossible, it was incumbent upon the bridge personnel to promptly notify the ship to this effect by resort to signals customarily employed under the circumstances. Munroe v. City of

Chicago, Clement v. Metropolitan Ry. Co., The Bellatrix, note 58, supra; see also Conklin v. City of Norwalk, 270 F. 68 (2 Cir. 1920), and Conners Marine Co. v. New York & Long Branch R. Co., note 63, supra, and cases therein cited.[80] A necessary corollary of these alternative duties is the obligation of the tower operator to convey accurate information, free of any misleading quality, over the radiotelephone; it was both foreseeable and customary that all representations made in the course of these conversations would be relied upon by the pilot in navigation of the vessel. The bridge operators breached these duties, as the evidence conclusively shows. Consistent with these requirements, the vessel at 12:34 was informed of the delay which would ensue because of the anticipated passage of the train. The breach of care by the bridge tenders occurred after its crossing: having observed its passage, the pilot had no reason to expect further delay; in reliance upon the 12:34 conversation, he reasonably assumed the bridge would promptly open. In support of this assumption, he was informed at 12:39 that the bridge was opening. Yet the bridge was not open to its full extent until 7½ minutes after the passage of the train. The record is barren of explanation for this delay. There is testimony that four minutes were generally required to open the bridge after electronic release by the tower operator; two

---

77. Ibid.

78. At least one commentator suggests that the doctrine be discriminatingly applied in maritime proceedings to avoid the harsh rigidity of the divided damages rule, when one party is but slightly at fault. 58 Mich.L.Rev. 276, 277 (1959). This is not the situation here. As is clear from the foregoing text, the court finds the vessel without fault in its approach.

79. N.T. 658, 784.

80. Failure to respond with statutorily prescribed signals to the vessel's whistle is also a violation of The Pennsylvania rule, though the court finds it unnecessary to

resort to this strong presumption in this case. See the Army Engineers Regulation in the text, supra, and notes 63 and 64, supra, and accompanying text. There is considerable doubt as to whether the vessel's whistle signal at 12:40 was heard by those on the bridge, see note 72, supra. In the event the signals were not heard because of prevailing winds, compliance with the Engineers regulation would be impossible due to natural circumstances beyond the control of the drawtender. It would seem, therefore, that no violation of the regulation occurred, whence The Pennsylvania rule has no applicability.

minutes were devoted to preparation to activate the drawspan machinery, and two minutes consumed during the actual swinging motion. Consistent with this, both drawtender and tower operator testified that the bridge was fully opened at 12:40—exactly four minutes after the passage of the train. But the more persuasive testimony of the Coast Guardsmen on board ship places the time of opening at 12:43½, and the court accepts this latter version as fact. The drawspan did not begin to open until 12:42, simultaneous with the ship's release of the anchor. This delay contravened the assumption, properly inferred from the 12:34 conversation and expressly verified at 12:39, that the drawspan would promptly open after the train's passage. The misleading qualities of the radiotelephone conversations resulted in the invitation to proceed and were relied upon by the pilot.[81] This fault was substantially the sole cause of the ensuing collision; because of this breach of duty, liability for damages suffered by the ship must be borne by those in charge of the bridge.

For the reasons set forth in this opinion, the libel against the Marie Leonhardt will be dismissed. A decree will be entered in favor of cross-libellant Leonhardt & Blumberg against The Pennsylvania Railroad Co., for whatever damages suffered by the ship in the collision as are properly compensable according to law and proven by acceptable standards.

This opinion shall constitute findings of fact and conclusions of law in accordance with Admiralty Rule 46½, 28 U.S.C.A.

Submit order accordingly.

81. Notes 60–61, 70, supra, and accompanying text.